Joseph E. DISTER, Plaintiff–Appellant,

v.

The CONTINENTAL GROUP, INC.,
Defendant–Appellee.

No. 876, Docket 87–7995.

United States Court of Appeals,
Second Circuit.

Argued March 21, 1988.

Decided Oct. 3, 1988.

Joseph D. Garrison, New Haven, Conn. (Garrison, Kahn, Silbert & Arterton, New Haven, Conn., of counsel), for plaintiff-appellant.

William C. Bruce, New Haven, Conn., for defendant-appellee.

Before FEINBERG, Chief Judge, and CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

Plaintiff Joseph E. Dister appeals from an October 30, 1987 judgment of the United States District Court for the District of Connecticut (Eginton, J.) granting the motion of the defendant The Continental Group, Inc. (Continental) for summary judgment and dismissing plaintiff's complaint. The district court held that Dister had failed to raise a genuine issue of fact as to whether Continental, by terminating him four months and seven days before he qualified for enhanced pension benefits, violated § 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 895 (codified at 29 U.S.C. § 1140 (1982)). This dashed plaintiff's apparent hope that had he but lingered a little longer as an employee and obtained the enhanced pension benefits, then the best was yet to come; his future would be secure.

This appeal requires us to decide for the first time what order and method of proof should be used where an employee sues his employer under § 510 of ERISA for an alleged discriminatory discharge. We bear in mind that in cases claiming discrimination of this sort, crucial evidence of an employer's unlawful motive is nearly always in short supply.

## FACTS

The now 51–year–old plaintiff began working at Continental in 1957 as a trainee. Twenty-five years later he had become Vice President/General Manager of Marketing and Product Development for the Continental Packaging Company (Continental Packaging), a division of Continental, with total annual compensation, including salary and an incentive bonus, of $117,500. In that position, Dister reported directly to the President of Continental Packaging, and his responsibilities focused on new product development in the packaging area.

After a corporate reorganization in 1982, plaintiff began reporting to John C. Ringgold, Continental Packaging's new Vice President/Administrative Officer. A year later his employer acquired a new President whose ideas concerning new product development differed from those of his predecessor. At this time Dister's role in the corporation began to change, and by late 1983 or early 1984 he had begun to worry whether his position was assured. Discussing his concerns with Ringgold and Richard D. Hofmann—an Executive Vice President to whom Ringgold reported—plaintiff was candidly told that his job might be eliminated. That prediction proved prophetic. In late 1983, Dister was given the option either of leaving the company and receiving an enhanced severance benefit package, or of remaining in the same position at the same salary, but without any staff. He chose the latter. Continental and Dister hold differing opinions regarding his duties in the position he re-

tained. Plaintiff claims that they were the same; defendant contends that they gradually diminished.

Later in 1984, Continental was purchased in a leveraged buyout. Dister testified that throughout that year he often had little, if anything, to do, and that there were "days upon days where the only thing that there was to do was to read the *Wall Street Journal* and trade magazines." At his deposition, he acknowledged a change in Continental Packaging's business priorities resulting from $2 billion in debt assumed in the leveraged buyout. Because of limited company resources to market the new products it already had, development of more new product lines became unlikely. It also became clear that with insufficient capital for acquisitions—an area involving plaintiff—Continental would divest itself of some operating units. When the 1985 budget for Continental Packaging was being formulated, executives were told to cut costs and overhead. According to Hofmann, Ringgold recommended the elimination of Dister's job and Hofmann agreed. On October 11, 1984 Dister was informed that he was discharged as of January 1, 1985. Twelve other CPC employees received similar notices.

Plaintiff's basic pension rights had vested prior to his termination. But under Continental's enhanced benefit package, known as the "75/80 Plan," an employee retiring before age 65 who has served Continental for a minimum of 15 continuous years and whose age plus years of service equals at least 80 is entitled to an unreduced pension as well as insurance and medical benefits. This plan applies in cases where business conditions force a shut-down of the employee's workplace or in certain cases of layoff or disability. Pursuant to the leveraged buyout agreement, Dister qualified for a "Change in Control Severance Package" which, in part, awarded him credit for two additional years of service were he to be fired. Taking these two years into account, Dister as of his discharge date was four months and seven days short of qualifying for the 75/80 Plan.

Plaintiff told Continental that of the 13 terminated employees he was the closest to vesting into the 75/80 Plan, and requested that his employment continue in some capacity so that his benefits could vest. Continental refused. Had Dister qualified for the 75/80 Plan, he would have received $6,821.37 per month immediately upon discharge. Under present benefits, he is entitled to receive $6,511.64 per month upon reaching age 55. Plaintiff estimates that had he qualified for the 75/80 Plan, he would have received an additional $550,000.

Plaintiff's last day of work at Continental Packaging was December 31, 1984. On January 2, 1985 he filed this action in the District of Connecticut alleging that Continental purposefully interfered with his right to retirement benefits in violation of § 510 of ERISA. After extensive discovery, the district court found that the allocation of burdens and order of presentation of proof employed in discrimination suits brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1982), and under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634 (1982), applies in cases of alleged discriminatory discharge under ERISA. It determined that Dister had established a prima facie case of wrongful treatment under ERISA. But Judge Eginton went on to hold that plaintiff had not presented sufficient evidence to create a genuine issue of fact as to whether Continental's asserted nondiscriminatory reason for terminating him was pretextual. Accordingly, he granted Continental's motion for summary judgment and dismissed Dister's complaint. Although we affirm, our reasons for reaching this result are slightly different from those relied upon by the district court.

## DISCUSSION

### I  *Proving an ERISA § 510 Case*

#### A.  *The Substantive Law*

■ This action was brought pursuant to § 510 of ERISA, which provides in part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline,

or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan]...." 29 U.S.C. § 1140 (1982). Section 510 was designed primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980). An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd mem.*, 742 F.2d 1441 (2d Cir. 1983).

On the other hand, "[n]o ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Titsch*, 548 F.Supp. at 985; *see Gavalik*, 812 F.2d at 851 ("Proof of incidental loss of benefits as a result of termination will not constitute a violation of § 510."); *Corum v. Farm Credit Servs.*, 628 F.Supp. 707, 718 (D.Minn.1986) (plaintiff must show more than "lost opportunity to accrue additional benefits" to sustain a § 510 claim); *Baker v. Kaiser Aluminum & Chem. Corp.*, 608 F.Supp. 1315, 1319 (N.D.Calif.1984) ("The only evidence offered by plaintiff is that if he had not been terminated, he would have been able to accrue additional benefits."). ERISA does not guarantee every employee a job until he or she has fully vested into a company's benefit plan. Plaintiff is required to prove more than the single fact that his termination precluded him from vesting into the 75/80 Plan; he must demonstrate Continental's unlawful purpose in firing him.

## B. *Burdens and Order of Proof Under McDonnell Douglas*

Because the existence of a specific intent to interfere with an employee's benefit rights is critical in § 510 cases—yet is seldom the subject of direct proof—the district court allocated the burdens of production and order of proof in a manner similar to the approach used in Title VII and ADEA cases, where direct evidence of discriminatory intent is also scarce or nonexistent.

The Supreme Court first set forth its three-step analytical framework for indirect proof of intent in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973) (Title VII), and has since summarized the procedure

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection...." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825). This structure of proof is premised on two assumptions. First, employers make business decisions for a reason, not at random. Second, when all valid, nondiscriminatory business reasons for the decision have been eliminated, common experience with employment discrimination suggests it is likely that the decision was based on unlawful considerations. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *see also* Note, *Indirect Proof of Discriminatory Motive in Title VII Disparate Treatment Claims after Aikens*, 88 Colum.L.Rev. 1114, 1120 (1988), When an employment decision is adverse to a plaintiff, the shifting burden of proof is designed to sharpen vague allegations of

discrimination and flush out the true reasons that prompted an employer's action.

In addition to shifting burdens of production, the Court in *McDonnell Douglas* implemented its underlying premises by creating a presumption of discrimination. Upon proof of a prima facie case of discrimination, a presumption arises that the employer unlawfully discriminated against the employee. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. The employer must then rebut that presumption by producing evidence of a legitimate, nondiscriminatory reason for its actions toward the plaintiff, though at this stage the employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id;* *see Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978) (employer need only articulate, not prove a nondiscriminatory reason to meet the prima facie case). If the employer is successful, the presumption drops out of the case.

The plaintiff's ultimate burden of persuading the trier of fact that he or she was the victim of intentional discrimination then merges with the plaintiff's burden of proving that the employer's reason is pretextual. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. This may be accomplished "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. The *McDonnell Douglas* method is not a rigid ritual, but simply an orderly way to evaluate proof when discrimination is claimed. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). Although the burden shifting set forth in *McDonnell Douglas* arose and was refined in the context of employment discrimination under Title VII, *see Burdine*, 450 U.S. at 250, 101 S.Ct. at 1092; *McDonnell Douglas*, 411 U.S. at 793–94, 93 S.Ct. at 1820; *Meiri v. Dacon*, 759 F.2d 989, 994 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), we have utilized the same methodology in the ADEA context, *e.g.*, *Russo v. Trifari,* *Krussman & Fishel, Inc.*, 837 F.2d 40, 43 (2d Cir.1988); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir.1983).

■ We hold that the *McDonnell Douglas* presumptions and shifting burdens of production are equally appropriate in the context of discriminatory discharge cases brought under § 510 of ERISA. *See Gavalik*, 812 F.2d at 852 (applying *McDonnell Douglas* in ERISA § 510 case). The allocation of burdens and imposition of presumptions in Title VII and ADEA cases recognizes the reality that direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier. Specific intent will only rarely be demonstrated by "smoking gun" proof, *see Gavalik*, 812 F.2d at 852, or by " 'eyewitness' testimony as to the employer's mental processes," *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482; *see also Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir.1984) ("[I]n most employment discrimination cases direct evidence of the employer's motivation is unavailable or difficult to acquire...."). The *McDonnell Douglas* procedure attempts to compensate for this lack of evidence to ensure that the employee has his or her day in court. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.1979). The task confronting an ERISA plaintiff—such as Dister, who must show that Continental acted with the specific intent to deprive him of his 75/80 Plan benefits—remains as difficult as that posed to Title VII and ADEA plaintiffs.

Moreover, by directing an orderly presentation of proof, the *McDonnell Douglas* methodology aids courts in resolving the often amorphous claims of discrimination and thereby to fulfill the expansive remedial aim of § 510. It was Congress' purpose that its ERISA enforcement provisions provide benefit plan participants with "broad remedies for redressing or preventing violations of the Act.... [Such] safeguards are required to ... completely secure the rights and expectations" created by ERISA. H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. &

Admin.News 4639, 4655; *see* S.Rep. No. 127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4838, 4872. In sum, the *McDonnell Douglas* approach serves to benefit both the court and the parties to an employment discrimination action, and we believe its application appropriate here.

## C.  *Methods of Proving Pretext*

As noted above, *Burdine* provides that an employee may satisfy the ultimate burden of proving pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *see also Aikens*, 460 U.S. at 718, 103 S.Ct. at 1483 (Blackmun, J., concurring) (plaintiff can prevail upon a showing that employer's nondiscriminatory reason is not its true reason for an employment decision). Nonetheless, Continental argues—and the district court held—that merely raising a genuine issue of fact as to the credence of Continental's asserted reason is an insufficient basis to refuse the grant of summary judgment. According to the district court, "[e]ven if a jury were not to believe the stated reasons for Dister's termination, it does not follow perforce that those stated reasons were a pretext for the defendant's intent to deprive him of enhanced pension benefits." Rather, Dister needed to adduce "facts, which if taken as true, could lead a jury to believe that the defendant harbored the requisite intent." *Dister v. Continental Group, Inc.*, No. B 85–3 (D.Conn. Oct. 26, 1987).

We disagree. While the district court's view covers direct proof of Continental's possible discriminatory motive, it does not take into account indirect evidence bearing on the employer's motive. *Burdine* made it plain that in addition to directly proving a discriminatory motive for firing, a plaintiff may prevail upon a showing that the employer's given legitimate reason is unworthy of credence, that is, that the reason supplied was not the true reason for the unfavorable employment decision. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

The theory underlying the framework for indirectly proving discrimination supports this view. The *McDonnell Douglas* system of proof, as already discussed, is premised on the empirical observations that (1) employers generally act for a reason, and (2) those who can demonstrate no legitimate reason for acting more likely than not acted for a discriminatory reason. Yet when the employer's nondiscriminatory reason is shown to be unworthy of belief, and could not therefore have been the real cause, the employer has in substance failed to articulate a valid explanation for discharging an employee and, moreover, has placed its credibility into question. In the context of a trial, "[i]f the plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reason, then the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent...." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (3d Cir.), *cert. dismissed,* — U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987) (ADEA).

We have previously indicated in accordance with these basic principles that pretext can be established by a showing that the "asserted neutral basis was so ridden with error" that the employer obviously could not honestly have relied on it. *Lieberman v. Gant,* 630 F.2d 60, 65 (2nd Cir.1980) (Title VII). We reaffirm this view today and join our sister circuits in finding that a plaintiff may prevail at trial if, in addition to establishing a prima facie case, he persuades a reasonable jury that the reason advanced for his discharge—job elimination due to business priorities and organizational changes—was unworthy of credence. *See Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1563 (11th Cir.1987) (Title VII); *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 18 nn. 6, 7 (7th Cir.1987) (ADEA); *Chipollini,* 814 F.2d at 900 (ADEA); *Tye v. Board of Educ.,* 811 F.2d 315, 319–20 (6th Cir.) (Title VII), *cert. denied,* — U.S. ——, 108 S.Ct. 285, 98 L.Ed.2d 246 (1987); *Thornbrough v. Co-*

*lumbus & Greenville RR.*, 760 F.2d 633, 639–40 (5th Cir.1985) (ADEA); *Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1232 (D.C.Cir.1984) (§ 1981). *But see Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987) (plaintiff cannot prove pretext in an age discrimination case "simply by refuting or questioning the defendants' articulated reason."); *White v. Vathally*, 732 F.2d 1037, 1042–43 (1st Cir.) (refuting employer's articulated reason is not sufficient in a Title VII case), *cert. denied*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984). In short, when an employer's explanation for firing an employee is unconvincing, it risks an adverse verdict under ERISA.

Accordingly, we now turn to the district court's application of *McDonnell Douglas* to the facts of the instant case and to its conclusion granting summary judgment to Continental.

## II  *Propriety of Summary Judgment*

Under Fed.R.Civ.P. 56(c) summary judgment shall be granted if viewing the record in the light most favorable to the nonmoving party, *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), the evidence offered demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986).

Rule 56(c) "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original). The materiality of particular facts is determined solely by reference to the substantive law applicable in the case, independent of any proof or evidentiary requirement imposed by the substantive law. *Id.* at 248, 106 S.Ct. at 2510. A "genuine" dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.

*Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Plaintiff first claims that summary judgment is inappropriate when the material fact at issue is an employer's intent, motivation, and state of mind. Concededly, where such is the issue summary judgment should be used sparingly. *See Meiri*, 759 F.2d at 998; *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984); *see also Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). A plaintiff must nevertheless offer "concrete evidence from which a reasonable juror could return a verdict in his favor," *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514, and is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind.

As we stated in a Title VII case, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri*, 759 F.2d at 998, *citing Nash v. Jacqueline Cochran, Inc.*, 548 F.Supp. 676, 678 (S.D.N.Y.1982). This is particularly true where, as here, full discovery has taken place. *See Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 755 (2nd Cir.1976). Since the propriety of summary judgment rests on the circumstances presented in each individual case, we examine those in this record.

### A.  *Plaintiff's Prima Facie Case*

Plaintiff's first burden under *McDonnell Douglas* is to establish a prima facie case of unlawful termination under ERISA. The nature of the plaintiff's burden of proof at the prima facie stage is *de minimus. See Sweeney v. Research Found. of the State Univ. of N.Y.*, 711 F.2d 1179, 1184 (2nd Cir.1983). In Title VII and ADEA cases, a plaintiff establishes a prima facie case of unlawful termination by showing that the plaintiff (1) belongs to a protected group, (2) was qualified for the posi-

tion, and (3) was discharged or denied employment under circumstances that give rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (Title VII); *Russo,* 837 F.2d at 43 (ADEA); *Pena,* 702 F.2d at 324 (ADEA).

▇▇▇▇Applying these standards in the ERISA context, Dister made out a prima facie case sufficient to withstand summary judgment: (1) Because § 510 of ERISA protects those employees who have an opportunity to attain rights in a covered benefit plan, *see* 29 U.S.C. § 1140 (1982), plaintiff is in a protected group; (2) There was abundant evidence that he was qualified for his position; (3) His discharge four months and seven days before his 75/80 Plan rights were to vest and the resulting substantial cost savings to Continental—approximately $550,000—are circumstances sufficient to give rise to an inference of discrimination.

Dister further alleges that an employment contract between Continental and his superior, Ringgold, entered into five months after plaintiff's forced departure proves an intent to avoid liability for benefits by discharging an unvested employee while inducing a vested employee to keep working despite his eligibility for retirement. *Cf. Gavalik,* 812 F.2d at 856 (liability avoidance scheme not to rehire laid off nonvested blue collar workers constitutes proof of discrimination). The record reveals that in order to induce Ringgold, who admittedly was qualified for the 75/80 Plan, to stay until June 30, 1988 Continental agreed to preserve for Ringgold the rights he had acquired under the lucrative "Change in Control Severance Package." There is no allegation that Ringgold—who had been Dister's superior since 1982—substantially "replaced" Dister. Although the absence of this circumstance "may weaken ... [it] certainly does not eliminate, the inference of discrimination." *See Meiri,* 759 F.2d at 996.

Hence, Dister offered adequate evidence to defeat summary judgment at the prima facie stage. The burden of production therefore shifted to Continental.

### B. Defendant's Nondiscriminatory Reasons

▇▇▇ To dispel the inference of discrimination arising from the establishment of a prima facie case, Continental is required to articulate—but not prove—a legitimate, nondiscriminatory reason for the discharge. *See Burdine,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95. The employer's explanation must be "clear and specific." *Meiri,* 759 F.2d at 997. The district court found Continental's asserted reason for terminating Dister legitimate and nondiscriminatory: the termination resulted from a corporate reorganization and a concomitant change in business priorities directed toward revising the employer's product development goals and cutting overhead. The record before us amply supports this assertion. Continental therefore met its burden of articulating a legitimate reason for plaintiff's discharge.

### C. Plaintiff's Evidence of Pretext

▇▇▇ Continental having articulated a legitimate reason for Dister's discharge, plaintiff's burden at trial would be to prove by a preponderance of the evidence that the reasons advanced are simply a pretext for discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. As discussed more fully above, the evidence must—at a minimum—create a genuine issue of fact as to Continental's offered reasons or as to a discriminatory motive. Having carefully reviewed the record, we fail to find anything creating a genuine issue of fact either that Continental's reason for discharging Dister was unworthy of credence or that Continental was otherwise motivated by a discriminatory purpose.

Plaintiff first argues that certain evidence undermines Continental's assertion that his loss of employment was a result of job elimination due to a change in business priorities. He urges that there are inconsistencies in testimony of Continental executives concerning the specific circumstances of his discharge. For example, a Human Resources Vice President testified that Dister's job was eliminated in January, 1984. To a certain extent this is true be-

cause it was then that Dister was given the option of leaving or remaining without staff. In contrast, Hofmann testified that the job was eliminated in October, 1984 when Dister was notified of his termination. This, too, is not misleading. This suggested inconsistency is, at best, minor. Viewing the evidence in the light most favorable to plaintiff, there are no material inconsistencies that might cause a reasonable jury to doubt Continental's explanation for Dister's discharge from employment.

Plaintiff next points to public speeches made by Continental executives subsequent to his loss of employment that emphasized Continental's efforts to promote product development—the area in which he had worked—and to pursue growth opportunities. Beyond the limited value of these public comments—generally issued to place a corporation in its best light with investors—they fail to call into question Continental's elimination of Dister's job. Continental did not claim that its reason for discharging Dister was that *all* growth and product development was eliminated. It only asserted that Dister's job was no longer necessary or practicable in light of its current business goals and its need to reduce costs.

Even conceding this, Dister asserts that he still had an important role to fill at Continental, calling attention to projects he was forced to leave behind and their value to Continental. He states in a conclusory fashion that Continental retained him as a consultant after his termination, suggesting that the job he performed was in fact necessary. The record only supports the inference that Dister offered to perform such work, and that Continental declined the offer.

Several legal propositions additionally bear on the subject of plaintiff's contribution to Continental. To begin with, it is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal. *See Burdine,* 450 U.S. at 259, 101 S.Ct. at 1097 ("The fact that a court may think that the employer misjudged the

qualifications of the applicants does not in itself expose him to Title VII liability...."); *see also Meiri,* 759 F.2d at 995. Section 510 protects employees from conduct designed to deprive them of rights created under employee benefit plans; it does not cast liability on an employer for misjudgments respecting an employee's contribution to the company. Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons. *See Graefenhain,* 827 F.2d at 20 ("A business decision need not be good or even wise. It simply has to be nondiscriminatory...."). Thus, the reasons tendered need not be well-advised, but merely truthful. *See Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.) (Title VII), *cert. denied,* — U.S. —, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

This does not mean that an employer is entitled to summary judgment in every case in which it relies upon business judgment in making an employment decision. A court's perception that an employer misjudged an employee's qualifications might be probative in some cases on the issue of pretext. *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1097. The distinction lies between a poor business decision and a reason manufactured to avoid liability. Thus, facts may exist from which a reasonable jury could conclude that the employer's "business decision" was so lacking in merit as to call into question its genuineness. *See Sparks,* 830 F.2d at 1564 ("implausibility" of alleged reason sufficient to create genuine issue of material fact); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 205 (3d Cir.1987) (reversing entry of summary judgment because of "inconsistencies and implausibilities in employer's proffered reasons for discharge...."), *cert. denied,* — U.S. —, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988); *Lieberman,* 630 F.2d at 65 (2d Cir. 1980) (asserted reason might be "so ridden with error that defendant could not honestly have relied up on it"); *Loeb,* 600 F.2d at 1012 n. 6 ("The more idiosyncratic or questionable the employer's reason, the easier ... to expose it as a pretext...."); *see*

also *Nordquist v. Uddeholm Corp.*, 615 F.Supp. 1191, 1201 (D.Conn.1985) (genuine issue as to employer's "economic cutbacks" rationale where employer advertised an available position for which discharged employee was qualified).

Such is not the present case. The need for Dister's position had been called into question by late 1983. He acknowledged that on many days in 1983–84 he had little or nothing to do. Moreover, as discussed earlier, he testified at his deposition that a change in business priorities had led to a material reduction in his duties. *Cf. Nash*, 548 F.Supp. at 680 (plaintiff conceded that reason for termination "was simply a business judgment on their part, I suppose"). Given these concessions, the evidence does not support a finding that Continental's reasons for its action were not honestly held.

Nor is there other evidence to support a finding either that Continental's reasons are unworthy of credence or that Continental was motivated by a discriminatory reason. In fact, Dister offers scant evidence to demonstrate pretext other than that used to establish his prima facie case.[1] He relies heavily on the fact that Continental refused to allow him to remain working in some capacity until his 75/80 Plan rights vested, yet this is irrelevant to his § 510 case, absent proof that others were more favorably treated.

Plaintiff also directs attention to occurrences in the 1970's, when Continental was found to have violated or alleged to have violated § 510. *See Gavalik*, 812 F.2d 834, *supra; see also McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492, 1497–98 (D.N.J.1985). This set of events involved a "liability avoidance" scheme under which Continental maximized savings during plant closings and layoffs of blue-collar union workers in part by discharging unvested workers. *Gavalik*, 812 F.2d at 838–41, *McLendon*, 602 F.Supp. at 1497–98. The scheme's existence was well-documented in Continental's internal records. *See Gavalik*, 812 F.2d at 840–41.

Beyond the common corporate employer, Dister fails to show any similarity between the *Gavalik/McLendon* events and his discharge. The earlier plan was initiated more than a decade ago and affected manufacturing—not executive—employees. Further, no statistical or other evidence is offered from which an inference could be drawn that Continental was engaging in a similar scheme when it discharged plaintiff. *Cf. Nash*, 548 F.Supp. at 680 (noting absence of statistical proof). We conclude therefore that upon the facts presented no reasonable jury could find that Continental was in fact motivated either directly or indirectly by a discriminatory reason when it discharged Dister.

## CONCLUSION

To summarize, the proper analytical framework for deciding this appeal is found in the three-step *McDonnell Douglas* approach, which consists of the employee's prima facie case, an employer's articulated reason in rebuttal, and the employee's proffered proof of pretext. Analysis of these three steps reveals the lack of evidence supporting Dister's § 510 claim. Continental successfully rebutted the presumption of discrimination created by Dister's prima facie case by articulating a

---

1. Plaintiff argues that (1) his close proximity to vesting into the 75/80 Plan at the time of his termination, coupled with (2) the substantial savings that accrued to Continental due to Dister's failure to vest is sufficient to create a genuine issue of fact as to discriminatory discharge. In support of this contention, Dister cites our opinion in *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278 (2nd Cir.1987) (affirming judgment for plaintiff on ADEA and ERISA claims), where we upheld a trial court's finding that the plaintiff was discharged in order to prevent vesting of pension benefits. There, we found "ample basis for the triers of fact to determine that appellants fired Reichman to save money from her pension." *Id.* at 281. However, *Reichman* involved evidence of unlawful motivation beyond "proximity to benefits" and "cost savings." For example, a principal of the employer reportedly said that " 'he wouldn't be at all surprised' " if the employee was being harassed by the employer because of her imminent vesting. *Id.* Accordingly, *Reichman* cannot be read to mean that mere cost savings and proximity to benefits are sufficient *per se* to create a genuine issue of fact requiring a trial.

legitimate reason for discharge, and plaintiff fails to raise a genuine issue of fact as to whether Continental's articulated reason was unworthy of credence. Moreover, he provides scant evidence which might establish a discriminatory motive.

As a consequence, we conclude that no reasonable jury could find from plaintiff's evidence viewed in the light most favorable to him that Continental intentionally fired him in order to interfere with attainment of his 75/80 Plan benefits. Continental has therefore met its burden in showing that there is no genuine issue of fact for trial. The judgment of the district court granting Continental's motion for summary judgment is accordingly affirmed.

JUDGMENT AFFIRMED.