904 F.2d 161
 54 Fair Empl.Prac.Cas. 1219,
53 Empl. Prac. Dec. P 39,988
Shawki R. IBRAHIM, Plaintiff-Appellant,
v.
NEW YORK STATE DEPARTMENT OF HEALTH, OFFICE OF HEALTH
SYSTEMS MANAGEMENT, New York State Department of
Civil Services, New York State
Department of Audit and
Control, Defendants-Appellees.
 No. 494, Docket 89-7454.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 21, 1989.
Decided May 25, 1990.
 
 Robert Ligansky, New York City, for plaintiff-appellant.
 Charles F. Sanders, Asst. Atty. Gen. of the State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Barbara B. Butler, Asst. Atty. Gen. of the State of N.Y., of counsel), New York City, for defendant-appellee New York State Dept. of Health, Office of Health Systems Management.
 Before OAKES, Chief Judge, CARDAMONE, Circuit Judge, and POLLACK, District Judge*
 CARDAMONE, Circuit Judge:
 
 
 1
 On this appeal we consider whether appellant who passed an open competitive civil service examination, but did not receive an appointment in the grade to which he was thereby entitled, successfully proved a Title VII violation. Federal and state laws designed to eliminate the pernicious effects of the "spoils system"--a concept that U.S. Senator William L. Marcy found unobjectionable when he first coined the phrase in 1832--have largely eradicated the notion that public office should be a reward for political work. We are faced instead with a more subtle form of favoritism, a partiality of the appointing officials to those persons already at work in the subject agency. The advancement of such persons in public office without regard to the purpose of those laws which mandate that such appointments be based on merit and fitness is called cronyism. The reason for not appointing an otherwise qualified outsider may not rest solely on a preference for present workers where, as here, this reason is merely a mask to cover discriminatory animus.
 
 
 2
 Appellant, Shawki Ibrahim, who had passed the required New York State grade 27 civil service examination for the position of Principal Health Care Fiscal Analyst (principal fiscal analyst) and had been on an eligibility list for that position since December 12, 1978, appeals from a March 29, 1989 order of the United States District Court for the Eastern District of New York (Dearie, J.) holding that appellee, the New York State Department of Health (Department), Office of Health Systems Management, did not violate Title VII, 42 U.S.C. Sec. 2000e et seq. (1982), by failing to promote him. Ibrahim also appeals the district court's denial of his motion for judgment notwithstanding the verdict (j.n.o.v.) or, in the alternative, for a new trial after the jury found in favor of the Department on Ibrahim's claim under the Age Discrimination in Employment Act, 29 U.S.C. Sec. 621 et seq. (1982). We reverse the denial of relief under Title VII, but decline to reach or decide appellant's claim under the ADEA, and remand the case to the district court for a determination of damages.
 
 FACTS
 
 3
 The Department, contains the Office of Public Health and the Office of Health Systems Management. Within the Office of Health Systems Management lies the Finance Division which contains both the Bureau of Audit, the bureau in which appellant began his career at a grade 23 position, and the Bureau of Residential Health Care Facility Reimbursement (Reimbursement Bureau), the bureau which denied appellant a promotion to a grade 27 position forming the basis of this litigation. Both bureaus provide grade 23 "associate" and grade 27 "principal" positions. Under New York law, these positions are ordinarily filled by selection from lists of those who have passed the required civil service examination. If the names of fewer than three active candidates appear on an eligibility list, Sec. 61 of the New York Civil Service Law provides bureau supervisors with the discretion to decline to make permanent appointments.
 
 
 4
 Appellant is an exceptionally well-educated middle-aged Egyptian holding bachelor's and masters' degrees in accounting, law, economics and political science from several Egyptian Universities. He came to the United States in 1971 and obtained a master's degree in accounting from Long Island University, a CPA appointment from the State of New York, and earned 26 credits from Brooklyn Law School that made him eligible to take the New York State Bar Examination. He began employment with New York State in February 1976 as a senior medical facilities auditor. In November 1977 he was promoted provisionally to associate medical facilities auditor, a grade 23 position, passed the appropriate civil service exam, and was permanently appointed as an associate auditor on June 8, 1978.
 
 
 5
 Ibrahim was well respected in this position, two of his former supervisors testified that the Bureau of Audit intended to promote him to principal medical facilities analyst, which was the next available grade 27 position. In 1978 appellant took and passed the civil service exam for this analyst position, being one of the 22 out of 49 who passed. But since there were no openings available, he was placed on an eligibility list on December 12, 1978 for a similar grade 27 position in the Reimbursement Bureau. The Department canvassed this list to determine if any of the candidates were interested, and then scheduled the 13 active candidates, including appellant, for an initial round of interviews.
 
 
 6
 Ibrahim attended a 40-minute interview with the Director of the Reimbursement Bureau, William Gormley, in which he alleges Gormley engaged in negative interviewing by discussing only the difficulties of the principal fiscal analyst position. Of those interviewed, four persons subsequently declined to be considered for the position and seven others were appointed as principal fiscal analysts in February 1979. At this time, the Department also temporarily appointed Michael Blinstrub as a principal fiscal analyst. Blinstrub--who was not eligible to take the grade 27 open-competitive examination that Ibrahim had passed--had taken the position on the understanding that he could be supplanted by the employee that he was "temporarily" replacing if that employee's provisional appointment to a higher grade did not become permanent.
 
 
 7
 With only appellant and Joseph Culpo remaining as eligible active candidates from the original 13, the Department determined that it was not obligated to appoint a candidate to a permanent principal fiscal auditor position under Sec. 61 of the Civil Service Law. It chose instead to retain three present employees, Alan Marshall and Robert Malecki, who were working in these auditing positions on a provisional basis, and Henry Higgit, an associate health care fiscal analyst, to fill the remaining principal positions provisionally. Malecki and Higgit did not have sufficient seniority to sit for the grade 27 civil service exam, and Marshall had failed the open competitive examination which appellant had passed.
 
 
 8
 In August and October 1979, the Department recanvassed the eligibility list attempting to find three active candidates. With an eligibility list consisting of only two active candidates--appellant and one other--the Department on both occasions exercised its discretion to reappoint the provisional appointees pending certification of an eligibility list containing at least three active candidates. As a result of an informal conference held on June 7, 1980 between appellant, Department officials, and a member of the affirmative action office, the Department agreed to re-interview Ibrahim when a re-canvass produced an active list of candidates. Upon re-canvass of the list of six candidates, three declined, and two, including appellant, temporarily declined after the interview.
 
 
 9
 At the interview, appellant stated that he would not be interested in the provisional public health care fiscal analyst position held by Blinstrub--one of the positions offered at the interview--because the position could be lost were another employee unable to attain a permanent position at a higher grade. The appellant also expressed concern about accepting one of the four positions held provisionally, after being advised that if he were appointed the existing provisional employee would be demoted and work under appellant's supervision. Ibrahim stated that he was leaving for Egypt the next day and was advised that he must therefore temporarily decline consideration for 90 days, which he confirmed in a letter dated June 28, 1980. With only one active candidate remaining on the eligibility list after the interviews and the Bureau about to embark on a rate setting scheme, the Department decided to "take a conservative approach and maintain the status quo" and thereby retained its provisional principal analysts.
 
 
 10
 In March 1981 the Department again re-canvassed the eligibility list of four candidates. They interviewed the two candidates who had temporarily declined consideration and decided not to interview appellant and the remaining candidate because they had been previously interviewed. Since there were only two active candidates left on the list, the Department once again, as in 1980, elected to retain the three provisional appointees.
 
 
 11
 In the interim, a grade 27 examination was held pursuant to Sec. 51 of the New York Civil Service Law. This examination was different than the open-competitive test that appellant originally passed because it was given only to applicants "in line" for a promotion to the principal fiscal analyst position. That is, it was given to grade 23 analysts with sufficient seniority in the Reimbursement Bureau and not grade 23 analysts in other bureaus. The eligibility list resulting from the promotional test superseded the prior eligibility list derived from the open-competitive test passed by Ibrahim under Sec. 56 of the Civil Service Law. Marshall, Higgit and Blinstrub, the three provisional principal analysts, passed and were chosen off the eligibility list to fill the permanent positions. The other provisional appointee, Malecki, did not pass and was demoted to associate fiscal analyst.
 
 PROCEEDINGS BELOW
 
 12
 Appellant originally brought this action under the Civil Rights Act, 42 U.S.C. Secs. 1981 and 1983 (1982), Title VII, 42 U.S.C. Sec. 2000e et seq. (1982), and New York Executive Law, N.Y. Exec. Law Sec. 296(1)(a) & (e) (McKinney 1982), against the Department and other state defendants. In an opinion entered on February 1, 1984, the district court (McLaughlin, J.) granted defendants' motion for summary judgment with respect to all claims, except plaintiff's claims under Title VII and New York Executive Law Sec. 296(1)(a). Ibrahim v. New York State Dep't of Health, 581 F.Supp. 228 (E.D.N.Y.1984). Later, appellant successfully moved to amend his complaint to include an age discrimination claim. He also moved to amend his complaint to add a national origin claim under 42 U.S.C. Sec. 1981 (1982). The Department responded by moving to amend its answer to include an affirmative defense of collateral estoppel against the age discrimination claim. The district court denied both motions.
 
 
 13
 A three-day trial was held on the ADEA and Title VII claims; the ADEA claim before a jury and the Title VII claim before the court. At trial, the Department moved for a directed verdict after the close of appellant's case and again at the end of the trial. Judge Dearie denied both motions, determining that Ibrahim had presented a prima facie case of discrimination, and that the burden had shifted to the Department to produce a legitimate nondiscriminatory reason for their failure to appoint Ibrahim. The jury returned a verdict in favor of the Department on the ADEA claim and the court ruled for the Department on the Title VII cause of action. In explaining its holding from the bench, the district court simply stated that it "credit[ed] the testimony of the state officials to the effect that they did not intend to discriminate against [appellant] because of his age, and ... national origin...." The trial court then concluded that the Department intended to protect the provisionals already part of the Reimbursement Bureau and had "absolutely no intention of offering the position to Mr. Ibrahim, or for that matter, anybody else[.]" The district court stated that while this motive might be contrary to the law's spirit at "least in this case we have a technical compliance with the Civil Service Law."
 
 
 14
 Appellant made a motion for j.n.o.v. under Fed.R.Civ.P. 50(b) or, in the alternative, for a new trial under Fed.R.Civ.P. 59 on the basis that a medical condition hindered his speech, which Judge Dearie denied. In denying j.n.o.v., the trial judge suggested that although Ibrahim established a prima facie case of discrimination and "may have proven ... that defendant violated the civil service law and defendant's own affirmative action policies" a reasonable jury could find and the evidence supported the court's finding that the Department's failure to promote Ibrahim was for nondiscriminatory reasons. See Ibrahim v. New York State Dep't of Health, No. CV 82-0177 slip op. at 1-2, 1989 WL 35926 (E.D.N.Y. Mar. 29, 1989). As to the motion for a new trial, the court found Ibrahim's speech comprehensible. Id.
 
 DISCUSSION
 
 15
 * Appellant alleges that the Department's failure to promote him to the position of principal fiscal analyst was based upon his Egyptian-Arabic national origin and was therefore in violation of Title VII, 42 U.S.C. Sec. 2000e-2(a) (1982). Section 2000e-2(a) provides, in pertinent part, that:
 
 
 16
 (a) It shall be an unlawful employment practice for an employer--
 
 
 17
 (1) to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin; or
 
 
 18
 (2) to limit ... or classify ... employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such ... national origin.
 
 
 19
 The Supreme Court fashioned the manner in which a Title VII action is presented by establishing the now familiar pattern of shifting burdens of proof. Complainant has the initial burden of proving a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for its action and, finally, complainant must show that the employer's stated reason was pretextual. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973). Once the employer satisfies its burden of production, the inquiry moves to "a new level of specificity," where the plaintiff has the burden of persuading the court "that the proffered reason was not the true reason for the employment decision." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255-56, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). The plaintiff may carry this burden "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 256, 101 S.Ct. at 1095.
 
 
 20
 This structure of proof is premised on the assumption that if all valid, nondiscriminatory business reasons for an employment decision are eliminated, "common experience with employment discrimination suggests it is likely that the decision was based on unlawful considerations." Dister v. Continental Group, Inc., 859 F.2d 1108, 1111 (2d Cir.1988); see also Furnco Constr. Corp. v. Waters, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Ultimately, the trial court must decide the question of whether the employer intentionally discriminated against the plaintiff--i.e., it must determine "whether defendants' purported business reasons are actually such." Gibson v. American Broadcasting Co., 892 F.2d 1128, 1132 (2d Cir.1989).
 
 II
 
 21
 Here--as the district court found and appellee does not contest--appellant has established a prima facie case of employment discrimination. Analysis turns therefore to whether the Department proffered a legitimate nondiscriminatory reason for its action. At trial, Department officials maintained that Sec. 61 of the New York Civil Service Law granted them discretion to provisionally appoint a principal fiscal analyst instead of hiring a permanent employee from the eligibility list of persons passing the grade 27 examination. Given this discretion they asserted that the institutional benefits derived from reducing employee dislocation combined with favorable performance evaluations of the three provisional employees justified their decision not to hire appellant.
 
 
 22
 We begin our discussion with a brief review of the Civil Service Law of New York. As the Department contends, Sec. 61 has consistently been interpreted to provide state employers with the discretion to depart from eligibility lists when those lists contain the names of fewer than three active candidates. Winkler v. Moore, 110 Misc.2d 785, 787, 442 N.Y.S.2d 937 (Sup.Ct.1981). Since the first eligibility list and every successive eligibility list contained the names of no more than two active candidates, the Department could properly decline to make permanent appointments from the lists provided.
 
 
 23
 The mere fact that the Department enjoyed the discretion to depart from the eligibility lists or was entitled under state law to appoint and re-appoint provisionals does not explain its refusal to promote appellant. To rebut a plaintiff's prima facie case of employment discrimination under Title VII it is not enough for a state agency simply to rely on the broad discretion granted it under state law to make hiring decisions. See Tye v. Bd. of Educ. of the Polaris Joint Vocational School Dist., 811 F.2d 315, 320 (6th Cir.1987). Instead, the employer must articulate the reasons underlying the exercise of its discretion. Id.
 
 
 24
 Title VII is by congressional design a federally mandated limitation on the discretion of employers with respect to their employment decisions. As such, it proscribes employment discrimination based on the race, religion, gender or national origin of an applicant. The requirement that an employer articulate with some specificity a nondiscriminatory reason for a hiring decision--adverse to a plaintiff who has produced a prima facie case--furthers the congressional aim by affording some small access to the otherwise hidden realm of employer motivation. Dister, 859 F.2d at 1111-12; Sweeney v. Research Found. of St. Univ. of N.Y., 711 F.2d 1179, 1185 (2d Cir.1983). This requirement also provides a plaintiff with "a full and fair opportunity to demonstrate pretext." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095.
 
 
 25
 Thus, had the Department simply relied on the broad discretion granted it under Sec. 61 as its justification for denying Ibrahim promotion, there is little doubt that it would have failed to articulate a legitimate, nondiscriminatory reason for its employment decision with enough specificity to rebut appellant's prima facie case of employment discrimination. The Department did not simply rely on its discretion, but provided testimony explaining its reasons. William Gormley and Kevin Wemett, both Reimbursement Bureau supervisors, testified that those retained and re-appointed as provisional principal fiscal analysts possessed, as functioning members of the Reimbursement Bureau, experience with and knowledge of the Department's procedures and rate-setting methods superior to appellant's. Given the provisional employees' satisfactory performance evaluations and that appellant received the lowest passing score on the promotional exam, Gormley concluded that "the provisional employees serving in the [principal fiscal analyst] positions were considered to have superior ability." Similarly, Wemett testified that the time constraints dictated by the Department's embarkation upon a new rate-setting program motivated the Reimbursement Bureau "to take a conservative approach and maintain the status quo" by exercising its discretion to re-appoint the provisionals after their third canvass of the eligibility list in the summer of 1980.
 
 
 26
 This testimony articulates a legitimate, nondiscriminatory reason for the Department's decision to keep its provisional employees rather than to appoint Ibrahim to a permanent position. Burdine, 450 U.S. at 254, 101 S.Ct. at 1094; see Sweeney, 711 F.2d at 1185. A hiring decision motivated by an employer's desire to minimize employee "downtime" during a particularly busy period is, without question, a legitimate business decision. With some objective measure for the comparison, so is the decision that one potential employee possesses superior ability and is better qualified than another. See Knight v. Nassau County Civil Serv. Comm'n, 649 F.2d 157, 161 (2d Cir.1981) (an employer must present "objective competent evidence" of qualification and "may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion"). Consequently, the Department discharged its burden of producing a legitimate, nondiscriminatory for its actions.
 
 III
 
 27
 Next, we consider whether the reasons given by the Department were pretextual. Under Article V, Sec. 6 of the New York State Constitution, "[a]ppointments and promotions in the civil service of the state ... shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable shall be competitive." Here appellant unlike the provisional appointees had passed the required civil service examination. Because passing the examination is a prerequisite to permanent appointment as a principal fiscal analyst, he was in at least one critical respect better qualified than those retained as provisionals. Beyond this the Department conceded at trial that appellant had attained a higher level of education and had greater accounting related work experience than any of the provisionals.
 
 
 28
 Moreover, the Department's contention that appellant's lack of experience in the Reimbursement Bureau made him less able than the retained provisionals is severely undercut by Bureau Director Gormley's evaluation of Ibrahim sent in a letter to the affirmative action coordinator
 
 
 29
 Mr. Ibrahim demonstrated that he possessed the necessary qualifications and capabilities to perform these functions. His background and manner in which he conducted himself was most impressive....
 
 
 30
 . . . . .
 
 
 31
 It is the opinion of the interviewers that Mr. Ibrahim is a definite asset to the staff of [the Office of Health Systems Management]....
 
 
 32
 With respect to the claimed institutional benefits of retaining current employees, we recognize that incidental costs are associated with training an individual to perform a new job, but the record reveals that the Department was willing to bear these costs in connection with its decision to promote seven of the 13 individuals whose names appeared on the first eligibility list. No proof presented by the Department provides a reason why re-training costs would be greater in Ibrahim's case. In addition, the suggestion that substantial costs would have been incurred by the necessity of training him as a principal fiscal analyst ignores the fact that Ibrahim was simply seeking promotion from one accounting-related position to another within the same department.
 
 
 33
 The partial explanation provided by Kevin Wemett, the former Assistant Director of the Reimbursement Bureau that, after Ibrahim's second interview, the Bureau was about to embark on a "rate setting scheme" and because of time constraints would benefit from retaining experienced employees is more of an excuse than a reason. The testimony regarding time constraints for the rate-setting project rings hollow because it focuses on the Bureau's work environment at only one point during the more than two years during which appellant sought promotion to the grade 27 position.
 
 
 34
 Similarly--under an admittedly perfunctory examination--the Department's claimed goal of preventing employee dislocation by retaining its provisionals reveals pretext. Ibrahim's uncontroverted testimony indicated that during his second interview he was told that if he were promoted, the provisional employee who had previously filled his position would serve under him. There was no evidence that the provisionals would be fired or asked to leave the Reimbursement Bureau should a permanent appointment be made. Instead, the only dislocation threatened was a return of these employees to their original jobs. Consequently, there was no evidence that appointment of appellant would have prejudiced the Bureau's institutional efficiency.
 
 IV
 
 35
 As previously noted, "Burdine made it plain that in addition to directly proving a discriminatory motive ..., a plaintiff may prevail upon a showing ... that the reason supplied was not the true reason for the unfavorable employment decision." Dister, 859 F.2d at 1113. The theory that underlies this system of proof relies, at least in part, on the observation that "those who can demonstrate no legitimate reason for acting more likely than not acted for a discriminatory reason." Id. We are here persuaded that appellant--by clearly demonstrating the pretextual nature of the Department's proffered explanation--met his ultimate burden of persuasion and should prevail in his Title VII claim.
 
 
 36
 The trial court found that Ibrahim did not establish a cause of action under Title VII notwithstanding its implied findings that the Department's proffered reasons were patently pretextual. In explaining its conclusion, the court acknowledged that "[t]he [hiring] decision was not ... totally on the merits" but because the Department "favored the provision[als.]" This explanation is insufficient to convince us that appellant thereby did not prove he was discriminated against, particularly where he has demonstrated that all the proffered reasons were pretextual. Despite its finding of pretext, the brief two and one-half page oral disposition by the district court judge of appellant's Title VII cause of action contains no analysis or reasons for its conclusion that there was no discrimination.
 
 
 37
 The finding of the district court was that there was a failure to hire the most qualified, most experienced person who passed the civil service examination while the overtime provisionals were either ineligible or had failed it. This pointed to discrimination based on national origin which was not negated by the Department officials. Unexplained by any reason given by the district court, its finding that there was no Title VII discrimination is clearly erroneous and justifies reversal of the judgment.CONCLUSION
 
 
 38
 Accordingly, we reverse the judgment of the district court and remand this case for a determination of damages. The damages available under Title VII include equitable relief and back pay, see 42 U.S.C. Sec. 2000e-5(g), and reasonable attorneys' fees, see id. Sec. 2000e-5(k). Because no additional relief would be available to appellant under the ADEA, we need not address the district court's denial of j.n.o.v. on that issue.
 
 
 39
 Reversed and remanded.
 
 
 
 *
 Hon. Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation