**Adolph C. BOWMAN, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Defendant.**

**No. 85 Civ. 8968 (PKL).**

United States District Court,
S.D. New York.

May 1, 1989.

Sussman & Sussman, Michael H. Sussman, Yonkers, N.Y., for plaintiff.

Benito Romano, U.S. Atty., S.D.N.Y., Ping Moy, New York City, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEISURE, District Judge.

This case was tried without a jury over 3 days in mid February, 1989. The pre-trial order submitted and prepared by the par-

ties contained proposed findings of fact and conclusions of law, and the parties supplemented those submissions after trial. Subsequently, the parties stipulated, with the Court's approval on April 27, 1989, that closing arguments, which were originally to be scheduled after the post-trial submissions, were not necessary and would not be held. The following opinion constitutes this Court's findings of fact and conclusions of law, made pursuant to Fed.R. Civ.P. 52(a).

### FINDINGS OF FACT

*Introduction.*

Plaintiff Adolph C. Bowman ("plaintiff" or "Bowman") is a black male, over forty years of age. Prior to leaving his job, plaintiff was employed as an Environmental Protection Assistant ("Assistant"), which carried a grade of GS–6,[1] in the Water and Hazardous Waste Compliance Section (the "section"), of the Permits Administration Branch ("PAB"), of the Policy and Management Division, Region II, of the United States Environmental Protection Agency ("EPA").

Plaintiff undertook and exhausted the requisite administrative steps before pursuing the present action in this Court. These actions began with interviews with Equal Employment Opportunity ("EEO") counselors, and proceeded through the filing and investigation of a formal complaint with the Region II EEO Office, the filing of a subsequent complaint based on harassment claims, and the consolidation of the hearings on those two complaints. The administrative actions culminated with a two day hearing on January 30–31, 1985, before EEOC Hearing Examiner Muriel Shapiro (the "administrative law judge" or "ALJ").

That ALJ found that the EPA's failure to promote plaintiff did not constitute discrimination. Plaintiff contests this portion of the ALJ's findings in the present action. The ALJ did however, find merit in the retaliation portion of plaintiff's complaint.

---

1. The initials "GS," used throughout these findings, refer to the general schedule government service classification of federal employees. As will become apparent, GS ratings are important in determining pay and responsibility ranges for particular jobs, with the higher numbered GS classifications generally indicating higher salaries, and concomitant levels of responsibility.

*See,* GX CCC.[2] The EPA adopted this recommended decision on November 15, 1985, and paid attorney's fees to plaintiff's prior counsel, as directed by the EEOC.

In his initial complaint, plaintiff sought declaratory and injunctive relief, as well as damages and fees. The basis of the equitable relief initially sought was alleged retaliation by the defendant, and defendant's continued non-compliance with the orders of the administrative law judge. Plaintiff has subsequently left his employment with defendant. Therefore, his position at trial was, quite properly, that it was no longer appropriate to seek injunctive and declaratory relief based on alleged violation of prior administrative orders and continued impermissible actions by the defendant. The issues that did remain for trial involved compensatory damages, and the basic discrimination claim by plaintiff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). Based upon the following findings and conclusions, the relief requested by plaintiff is granted.

*Plaintiff's Employment History.*

Plaintiff previously served in the military, and worked for the Post Office until forced to leave because of an injury, and consequent disability, in 1968. Plaintiff continues to receive some disability compensation for that injury, and must limit his work week to not more than forty hours because of the medical disability.

Plaintiff subsisted on that disability compensation for a couple of years after leaving the postal service. He took the opportunity to complete his high school education during that period, and further pursued his education through college-level courses. The disability payments alone were insufficient, however, to support Bowman and his children. Accordingly, Bowman began to seek employment in 1973.

Plaintiff was interviewed for a position at the EPA by James A. Sellar ("Sellar"),

and was hired in August, 1973. Sellar was at that time acting chief of the Permits Administration Branch. Sellar had no college degree. Although it seemed somewhat peculiar for a gentleman of Bowman's age to be seeking a clerical-typist position, Bowman and Sellar understood that his position could be re-evaluated, as the duties and responsibilities of his job evolved. *See, e.g.,* GX XXX at p. 64–65.

Plaintiff continued to work at the EPA through the commencement of this action. As noted, during the pendency of the action he left the EPA, due to deterioration of his physical condition. Bowman is currently employed as a security guard.

Bowman began his career as a clerk-typist, with a GS grade of 3 and an annual salary of $6128. At first, his duties were essentially of a clerical nature. His supervisor during his initial employment with the agency was section chief Ignatio Ruisi ("Ruisi"). PX 1, 2.

In 1974, Bowman shared a merit-based cash award with Ruisi and others for contributions to the section, specifically for the processing of an unusually large number of permits. PX 4.

In May 1975, plaintiff, who was then a GS–4 with a salary of $9367 per year, received a promotion to a GS–5 position, at an annual salary of $9915. GX D, PX 5. That new position was Environmental Protection Assistant ("Assistant"), in the newly created Water Compliance Section of the PAB. Ruisi discussed the promotion, and its implications, with Bowman.

In May 1976, Dr. Richard Baker ("Baker"), who was then head of the branch[3] of which Bowman's section was a part, recommended to the personnel department of the EPA that plaintiff be promoted to a GS–6 level. PX 8. Baker described the duties that were then being performed by Bowman, which went beyond mere clerical functions. Plaintiff received the promotion to a GS–6 level in June of 1976, at a then

---

**2.** References in the form "PX __" are to numbered plaintiff's exhibits, "GX __" to lettered government exhibits, and "Tr. __" to specific pages of the trial transcript.

**3.** That branch was, in 1976, called the "Status of Compliance Branch." It was later renamed the Permits Administration Branch.

annual salary of $11,274. GX LLL. Baker discussed that promotion with plaintiff.

Individual positions in the EPA, in addition to having a certain GS level, are a part of a particular numbered "series." A series is an organizational grouping of similar or related positions. The Environmental Protection "Assistant" series was redesignated from the "301 series" to the "029 series" in 1976. GX G.

Within a particular grade level, an employee periodically receives "step increases" in salary. Tr. 281–82. Plaintiff did receive such step increases during the course of his employment at the EPA. GX PP.

Plaintiff remained at the GS–6 level for ten [10] years, without further promotion, until he left his employment with the EPA in 1986. His annual salary when he left the EPA was $20,320.

*Procedures in the Section and at the EPA*

There are various ways that an individual may achieve a higher GS grade. These include reclassifications such as the ones plaintiff received in 1974, 1975 and 1976, internal merit applications, built-in career ladder advancements, "upward mobility" applications, and appointments to entirely new positions. Reclassification can occur when an individual employee's position undergoes an "accretion of duties" over a period of time.

Plaintiff made some effort to advance his position beyond the GS–6 level that he attained in 1976. As part of that effort he diligently took training courses in areas relevant to his job activities. PX 10.

In May of 1978, Baker and Ruisi sought reclassification of Bowman's position to a GS–7 grade. The EPA Personnel Office, which administers such re-classification requests, reviewed Bowman's Position Description and conducted a brief interview with Bowman. After this interview, or "desk audit," the reclassification was summarily denied. PX 14, 15; GX PPP, QQQ.

The PAB was initially a clerical support unit. Throughout the middle and late 1970's, however, the branch began to undertake more substantive, administrative

functions. *See, e.g.,* GX RRR at p. 4–5; Tr. 25. Baker, the chief of the PAB, determined to professionalize the unit. Beginning in 1976, the section began to utilize a multipart computer system with the acronym "WERS." That system automated functions that previously had been cumbersomely accomplished by hand. The system additionally made it possible for the section to undertake enforcement functions that would have previously been impossible. WERS consisted of various subsystems, which were also referred to by acronym. These included; (a) a "LEDS" system that identified non-complying polluters and structured enforcement priorities, (b) a "RICS" system that tracked major municipal, as opposed to industrial, polluters, and (c) a "NOFS" system that tracked contacted companies who were suspected to have permit requirements.

Some of these systems were instituted on a pilot or trial basis. As they developed, the plaintiff acquired the considerable skills necessary to accomplish the new tasks which the section was performing. Bowman was primarily responsible for the municipal permittee tracking through the RICS system, and subsequently became involved in more complex industrial tracking. Plaintiff's tasks involving the LEDS system were also more extensive than the analogous manual functions that he had previously performed. *See generally* Tr. 24–35.

*Efforts at Promotion.*

Clifford Lundin ("Lundin") was employed at the EPA from 1976 to 1981. Lundin succeeded Ruisi as the Section chief, and Bowman's supervisor, in 1979. Bowman discussed the possibility of a grade increase with Lundin, who responded that he would attempt to assure that the grade levels would reflect the level of performance in his section. In other words, Lundin instructed Bowman that he would have to demonstrate that he was doing higher grade work to receive Lundin's support for a reclassification. Lundin, as section chief, had no authority to directly alter the classifications of individual employees.

As indicated earlier, one method of gaining a higher classification was through application for the two or three "upward mobility" openings which might become available each year. Such applications had two components: at work job training, and supplemental after-work college study. Due to Bowman's medical limitations, he was restricted to a forty hour work week, and could not engage in such extended days. Nevertheless, plaintiff did apply for upward mobility positions. *See*, GX N; Tr. 214–17. No such applications were successful; either someone else was chosen for the position, plaintiff's physical illness prevented him from following through with the application, or the position was abolished *after* plaintiff was interviewed.

*The Failure to Promote Plaintiff*

In late 1980 and early 1981, after Bowman's promotion to a GS–6, Lundin noted a marked improvement in the skills of plaintiff, and increased complexity in the tasks performed by him. As discussed above, the tasks of the section itself were evolving and becoming more intricate and complicated. Indeed, there was no substantial difference between the duties being performed during that period by plaintiff and the white GS–7s *and above* in the section.

Individual positions in the EPA, and in the federal government generally, are characterized by official position descriptions ("PDs"), which enumerate the functions performed by the particular employee. At Baker's direction, Lundin re-drafted Bowman's PD, using an Environmental Specialist GS–7 PD as a model. The explicit purpose behind re-drafting plaintiff's PD was to aid in securing a reclassification promotion, which plaintiff's superiors felt that he deserved. Tr. 46–47, 328. That revised PD accurately reflected the duties which were being performed by plaintiff.

Lundin approached John Henderson ("Henderson"), who was at that time a "position classification specialist" with the personnel department of the EPA,[4] to discuss the perceived under-classification of Bowman. Lundin and Henderson also discussed the classification of Aretha White ("White"), who was a GS–6 and the only other black individual in the section. Henderson's expressed view, during that discussion, was that the GS–7 grades were generally for Environmental Protection Specialists ("Specialists"), and generally for individuals with college degrees. He stated that he would not switch plaintiff into the "Specialist" series, because of his preference to limit EPA Specialist positions to individuals with college degrees. Tr. 47. There was no requirement of any sort that GS–7's, whether in the "specialist" or "assistant" series, possess college degrees. Tr. 309; PX 11. Henderson also erroneously asserted that there was a "cap" of GS–6 on the Assistant title. Lundin's request, however, was open-ended, Tr. 356; GX–000, and did not specify a particular method of promotion, or promotion within a particular series.

At this meeting, Lundin argued that an employee named Rose D'Atri ("D'Atri"), who was white and a GS–7, did substantially less complex work than plaintiff. Henderson's response was that D'Atri was overrated, and in any event close to retirement. He also responded that Lundin should not assign the more complex tasks to Bowman. Tr. 50.

During the pendency of the reclassification request, Bowman met with Eugene Viti ("Viti"), at that time the Director of the Personnel Office at the EPA, to discuss avenues of advance. Viti did not express optimism about advancement to Bowman, and told him that advancement would require that Bowman undertake more complex tasks. Viti also mentioned the possibility that Bowman seek employment elsewhere if he was unhappy.

Several months passed, during which Lundin urged individuals in the personnel department to conduct desk audits of Bowman and D'Atri. Although such audits are routinely done when a reclassification request is made or when a supervisor requests such an audit of an employee, Tr. 305, no audit was undertaken. It was also normal to consult other available PD's in a

---

**4.** Henderson later replaced Eugene Viti ("Viti")   as the head of that department.

particular section in considering reclassification; no such comparisons were done in plaintiff's case. Tr. 362. Henderson eventually informed Lundin that Bowman's grade would not be increased.

Plaintiff was undeniably qualified for a GS–7 grade. *See, e.g.,* Tr. 355. The supervisors and employees familiar with the division of labor within the section, and with plaintiff's performance throughout the entire relevant period, were of the unanimous opinion that plaintiff's duties and qualifications warranted an additional reclassification promotion. *See, e.g.,* GX SSS; PX 21, 22, 23; Tr. 361. In December of 1980, Bowman received another merit-based cash award of $500. PX 12.[5] Although the position which plaintiff held was not in a career track with automatic periodic grade increases, the "no known promotion potential" label was not dispositive of plaintiff's opportunity for advancement. Tr. 308–09, 339, 400–02. As noted previously, Bowman had in fact received reclassification promotions in 1974, 1975 and 1976.

At the time, no reason was stated for the failure to promote plaintiff. At trial, Henderson justified his decision by asserting that he had compared Bowman's PD to "analogous" positions, Tr. 311, since there were no published OPM guidelines for Environmental Protection Assistant or Specialist positions. Henderson did not, however, consult other PDs for the section, including D'Atri's, which were available to him. Tr. 362. As noted above, Henderson did not investigate the work which Bowman was actually doing, did not arrange for a desk audit, and was unaware of any substantial accretion of plaintiff's duties.[6] These concerns were explicitly relevant in determining whether to promote Environmental Protection Assistants to higher GS levels. *See* PX 11.

In the period following the last reclassification of plaintiff as a GS–6, the accretion of plaintiff's duties accelerated, as did the complexity of the tasks he performed. Although accretion of duties and mastery of new techniques are admitted and justified bases for reclassification, *see,* Tr. 292, 340–42, PX 11, Henderson failed to examine those criteria with respect to Bowman, Tr. 341. He did not compare plaintiff's current PD with his prior 1976 GS–6 PD, to determine if the new PD reflected accretion of duties. Tr. 384. The sole basis articulated for the failure to promote plaintiff was Henderson's alleged review of plaintiff's revised PD. Tr. 341. Again, that PD had been patterned by Lundin on a PD previously approved by Henderson for reclassification as a GS–7 Specialist. *See,* Tr. 46–47. *Compare* GX Q; GX NNN.

Bowman's functions substantially overlapped with the activities that were being performed by white GS–7 specialists and assistants in the PAB. Tr. 96. The employees in the section functioned as a group, and there was an egalitarian sharing of responsibilities and duties. There were, however, discrepancies in the grade classifications. PX 60–A. D'Atri, in particular, maintained her (albeit incorrectly assigned) GS–7 grade, and performed substantially less complex tasks.

*Appeals and Continued Failure to Promote Plaintiff*

Lundin notified plaintiff of the refusal to promote him, and explained the appeals procedure which was available to him. Tr. 55–56. Basically, an employee could appeal a classification decision through a hierarchy; to a regional administrator, and then to the Office of Personnel Management ("OPM"). Tr. 319. Previously, the regional administrator had overridden Personnel's denial of a reclassification to Ruisi, and Lundin informed Bowman that the

---

5. Lundin met with Herb Barrack in connection with this merit award. In 1980–81 Barrack was the Director of the Planning and Management Division, of which Bowman's branch and section were a part. Barrack's opinion of plaintiff was that he was a "trouble maker," and only reluctantly approved the merit increase. *See* Tr. 58.

6. Henderson testified, for example, that a GS–7 grade might involve computer retrievals, and denied that Bowman performed such retrievals. It is clear, however, that Bowman was in fact performing computer retrieval functions comparable to those performed by GS–7s. *See, e.g.,* Tr. 64, 430–32.

branch had a history of success in that area of appeal. Tr. 55.

In February of 1981, plaintiff appealed Henderson's denial of reclassification as a GS–7 to the Region II EPA Regional Administrator, Charles Warren ("Warren"). Warren referred the appeal to a member of his staff—Henderson. Henderson, writing on Warren's behalf, denied that appeal, and issued a written opinion to that effect. PX 20. Henderson, under Warren's name but without actual discussion or consultation with Warren, found that the plaintiff's job was properly classified and fell within the "029 series," which was an Environmental Protection Assistant. Tr. 368–70; PX 20.

In or around August of 1981, Bowman appealed this denial of re-classification to the Office of Personnel Management ("OPM"), which is an agency separate and apart from the EPA. John McDermott, of the Agency Relations Division of the OPM, wrote to Viti seeking information about Bowman, as well as Viti's recommendation concerning action to be taken. PX 21. OPM also wrote to Bowman, but did not inform him that it was seeking the recommendation of his agency's Personnel Office. PX 22.

The matter was again referred to Henderson, who, writing on Viti's behalf, responded to the OPM. Tr. 319–20. Henderson essentially asserted that the classification of Bowman was correct and should not be disturbed. That was a determination that Henderson himself had initially made, and affirmed once upon appeal. Henderson again stated his erroneous view that the work being performed by plaintiff was not comparable to other GS–7 work. PX 23. Henderson also orally discussed Bowman's reclassification appeal with officials at OPM. Tr. 370. Bowman never saw Henderson's written response, which was signed by Viti. No independent audit or interview of Bowman's superiors was undertaken by OPM. On the basis of Henderson's written and oral representations, OPM upheld the EPA's classification of plaintiff as a GS–6 on June 14, 1982. PX 24.

From this point, Bowman and the immediate superiors who supported his efforts at promotion had to contend with the OPM "determination" that Bowman was properly classified, in their efforts to secure reclassification to accurately reflect plaintiff's duties. GX FFF, GGG.

In late 1982, Paul Zambratto ("Zambratto") became the new section chief of the Water and Hazardous Waste Compliance Section. When Zambratto became chief, there was an extraordinary backlog of permits in the section which needed to be processed. Zambratto met with Baker and Bowman to discuss that backlog, and also to discuss the possibility of a reclassification promotion for Bowman. Tr. 143. Zambratto had been under the initial misapprehension that Bowman was already classified as a GS–7 Specialist, based upon Zambratto's exposure to Bowman's work. Tr. 167. Processing of the backlog and promotion were connected; Baker and Zambratto indicated to Bowman that if the backlog was processed, they would attempt to secure a promotion for plaintiff. *See, e.g.*, Tr. 255. The backlog was in fact processed, and plaintiff played a primary role in that endeavor.

In the spring of 1983, Bowman requested a desk audit and reclassification promotion. PX 39. That request was passed on to the personnel department, who asked that Bowman's PD be re-evaluated. PX 40. Zambratto had no problem re-drafting the PD, and did so at Baker's request. The re-drafted PD was, again, part of a strategy to secure a grade increase for Bowman. The requested desk audit was never undertaken; Henderson again denied the reclassification.

After this 1983 denial, Bowman filed an EEO complaint, which eventually culminated in the hearing and findings by the ALJ discussed above. The present *de novo* proceeding was subsequently commenced in this Federal District Court.

Since 1983, the EPA has announced and filled several "Series 029," or Environmental Protection Assistant, positions. These Assistant positions have not been limited to a GS–6 level, and in fact have included

GS–7s. All of the positions have gone to white individuals. PX 13, 17. Following the ALJ's finding of improper retaliation against Bowman, which was based upon the failure to provide plaintiff with appropriate work assignments, Bowman continued to be passed over, in favor of other white employees, for distribution of the sort of challenging work which he sought. *See*, PX 54A, 25; Tr. 415.

CONCLUSIONS OF LAW

Jurisdiction in this Court is specifically conferred by 42 U.S.C. § 2000e–5.

Application of the substantive law in a discrimination action under Title VII presents perhaps the most challenging and subtle kind of problem with which this Court must grapple. The basic idea of impermissible discrimination is simple enough, but where "crucial evidence of an employer's unlawful motive is nearly always in short supply," *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1109 (2d Cir.1988), the translation of the theoretical substantive right into one enforceable in a court of law presents substantial complexities.

The Supreme Court has responded to the specific difficulties of proving unlawful discrimination by setting out the now well-established analysis involving shifting burdens and presumptions. *See generally McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). *See also Dister, supra*, 859 F.2d at 1111. Plaintiff must initially demonstrate, by a preponderance of the evidence, a prima facie case of discrimination. If this initial burden is met, a presumption of discrimination is created. The defendant must then rebut that presumption, by articulating some legitimate, non-discriminatory reason for the employment action.

If defendant articulates such a rationale, the final burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the reasons offered by the defendant were not its true reasons, but were pretexts for actual discrimination. This burden merges with the "plaintiff's ultimate burden of persuading the trier of fact that he or she was the victim of intentional discrimination." *Dister, supra*, 859 F.2d at 1112, (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

A plaintiff may directly show that it was "more likely" that a discriminatory reason motivated defendant. *Burdine, supra*, 450 U.S. at 256, 101 S.Ct. at 1095. Alternatively, and more pertinent to this case, a plaintiff will prevail "by showing that the employer's proffered explanation is unworthy of credence." *Dister, supra*, 859 F.2d at 1112 (*citing Burdine, supra*, 450 U.S. at 256, 101 S.Ct. at 1095). *See*, Note, Indirect Proof of Discriminatory Motive in Title VII Disparate Treatment Claims After *Aikens*, 88 Colum. L.Rev. 1114, 1120–23 (1988). This analysis is not a rigid ritual, but an orderly way for the Court to evaluate the evidence.[7]

Such an elaborate structure of proof is based upon two assumptions. First, employment decisions are not completely random; they are made for *some* reason. Second, when "all valid, nondiscriminatory business reasons for the decision have been eliminated, common experience with employment discrimination suggests that it is likely that the decision was based on unlawful considerations." *Dister, supra*, 859 F.2d at 1111 (*citing Furnco Const. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

*A. Plaintiff's Prima Facia Case.*

In the present case, little discussion need be devoted to this threshold concern. The *prima facia* showing which must be made

---

**7.** This case involves alleged disparate treatment of the plaintiff, and does not involve the potentially more substantial concerns of a disparate impact case. *See International Bd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (comparison of disparate treatment and disparate impact claims). The *McDonnell–Douglas* framework was specifically formulated for disparate treatment cases, wherein proof of discriminatory motive is crucial.

382

by plaintiff is *de minimus. Dister, supra,* 859 F.2d at 1114. *See also, Sweeney v. Research Found. of the State Univ. of N.Y.,* 711 F.2d 1179 (2d Cir.1983). In light of the factual findings made above, it cannot be seriously disputed that plaintiff belongs to a protected class, that he was qualified for a GS–7 position within the section, that he sought a reclassification promotion, and that the circumstances surrounding his failure to achieve a reclassification after the substantial evolution of his responsibilities gives rise to an inference of discrimination. *See, McDonald Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

### B. Rationale and Pretext.

This action is typical of the many Title VII cases where there is neither a "smoking gun," *see Gavalik v. Continental Can Co.,* 812 F.2d 834, 853 (3d Cir.1987), nor direct eyewitness testimony of the employer's mental processes, *see U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1982). *See also, Dister, supra,* 859 F.2d at 1112. To prevail under the analytical structure described above, therefore, the plaintiff must " 'convince[ ] the trier of fact that it is more likely than not that the employer did not act for its proffered reason.' " *Dister, supra,* 859 F.2d at 1113 (*quoting Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 899 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987)). If plaintiff persuades the trier of fact that the reason advanced for the failure to promote or reclassify him is unworthy of credence, he will prevail. *Dister, supra,* 859 F.2d at 1113.

Defendant here has asserted, as a nondiscriminatory justification for its failure to promote plaintiff, that Bowman's continued classification as a GS–6 was proper. Specifically, defendant points to allegedly neutral concerns underlying the decision not to promote plaintiff, an alleged unawareness of plaintiff's race, and to plaintiff's failure to seek alternate forms of advancement. Based upon the findings of fact made above, the Court concludes that plaintiff has met his burden of showing that the proffered explanations of defendant are pretextual.

Briefly, Henderson's testimony that he merely followed neutral procedures, and that the naked PD description which he reviewed in 1980 did not warrant reclassification, is not credible. Henderson's position is contradicted by examination of the revised PD, and by Lundin's testimony that the revised PD was re-written expressly for the purpose of securing a justified GS–7 reclassification for plaintiff. An assertion that formal, neutral procedures were merely followed is also belied by the failure of Henderson to secure a desk audit, to make himself aware of the evolution of Bowman's duties, or to ascertain or give credence to the opinion of Bowman's day-to-day supervisors, even when such factors were properly part of the formal procedure for reclassification promotion applications. Again, it is beyond dispute that plaintiff was qualified for a GS–7 level position.

At this trial in 1989, Henderson for the first time asserted that he was unaware of plaintiff's race throughout the relevant period. This is the first time that such a contention has been made in the numerous prior administrative proceedings involving Bowman, and the Court is not persuaded by this assertion. In 1983 Henderson was interviewed, and filed an affidavit, in connection with an EEOC investigation of the events which gave rise to this lawsuit. Henderson, a longtime personnel administrator, was admittedly aware that the 1983 EEO investigation concerned racial discrimination, Tr. 376, but did not at that time assert that he was unaware of Bowman's race in 1980–81. Tr. 380.

Viti was unquestionably aware of Bowman's race, and Henderson had substantial contact with Viti during 1980–81. Although Henderson denied it, there was also testimony to the effect that Henderson had contact with Herb Barrack,[8] and that Barrack had input into personnel reclassification decisions during that period. *See* Tr. 51. Barrack was specifically familiar with,

---

8. See footnote 5, *supra.*

and antagonistic to, Bowman. Tr. 58; GX SS. Plaintiff has sustained his burden of proving that the stated rationale for the refusal to promote him was pretextual, and this conclusion is not altered by defendant's less than persuasive arguments that plaintiff's race was unknown by a relevant agency actor.

Finally, defendant asserts that the existence of potential avenues of advancement within the EPA other than reclassification somehow justify the failure to reclassify Bowman. As discussed in the findings above, the merit promotions and other possibilities for advancement were either practically unavailable to plaintiff, or were actively sought. In any event, possible alternative means of advancement do not bolster defendant's rationale for failing to grant a justified reclassification promotion, and do not alter plaintiff's showing that the stated reasons for the denial of that reclassification were pretextual.

CONCLUSION

An allegation of racial discrimination is a serious charge. Unfortunately, it is too often the case that unwarranted, unsupported claims under Title VII can carry with them the potential for irreversible stigma, fostering of divisive attitudes and hardened prejudices, and actual exacerbation of the very ills which the Civil Rights Act of 1964 was designed to combat.

On the other hand, a plaintiff who has actually been the victim of invidious discrimination has a difficult and uphill battle in establishing a meritorious claim. This is true even with the aid of the specialized and complex case law which has developed for Title VII actions. In the present case, under the applicable law discussed above, plaintiff has accomplished the difficult task of establishing a Title VII violation.

The uncontested evidence in this case indicates that, in the EPA, the difference in salary between a GS–6 and the GS–7 position to which plaintiff was entitled was $2,000 per year. Tr. 182. Plaintiff claims damages for the time period from March, 1983, or two years before the filing of plaintiff's Title VII action, to November 1986, or the time of Bowman's resignation. *See,* Plaintiff's Post Trial Brief, at p. 25. Plaintiff also claims 9% interest, as an approximation of the market rate of return on that money. Such a rate of return is proper, *cf., McCrann v. United States Lines, Inc.,* 803 F.2d 771 (2d Cir.1986), and an award of pre-judgment interest in a Title VII action is within the discretion of the trial court. *Davis v. Const. Materials, A Div. of Ancar Enter.,* 558 F.Supp. 697 (N.D. Ala.), *aff'd without opinion* 720 F.2d 1293 (11th Cir.1983).

Accordingly, judgment for the plaintiff will be entered for $7993.33.

Finally, plaintiff's counsel has sought leave to file an application for attorneys fees in the event plaintiff prevailed. This case was well presented by both sides, and an award of fees is within the discretion of this Court. *See,* 42 U.S.C. § 2000e–5(k); *Krieger v. Gold Bond Bldg. Products,* 863 F.2d 1091, 1099 (2d Cir.1988). Plaintiff's counsel is directed to submit such an application by May 19, 1989. Defendant may respond to that application, by June 2, 1989. Plaintiff's reply, if any, will be submitted by June 9, 1989.

SO ORDERED.