635 So.2d 706 (1994)
Romulus FROST
v.
METROPOLITAN LIFE INSURANCE COMPANY, John E. Schmidt, George Laviolette, Hardy Theriot, Gabriel Fortier, Berwick Moore, Christine Romero and Mike Muffoletto.
No. CA 93 0753.
Court of Appeal of Louisiana, First Circuit.
April 8, 1994.
*708 R. Hamilton Davis, Lafayette, for appellee, Romulus Frost.
J. Louis Gibbens, New Iberia, Michael A. Patterson, Baton Rouge, for appellants, Metropolitan Life Ins. Co., et al.
Before CARTER, GONZALES and WHIPPLE, JJ.
GONZALES, Judge.
This is an appeal by Metropolitan Life Insurance Company from a judgment against it for firing one of its employees, Romulus J. Frost, in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461. Because we find that the factual determinations of the trial court are not clearly erroneous, we affirm.

FACTS
In February of 1960, Romulus J. Frost (Frost) began employment at Metropolitan Life Insurance Company (Metropolitan) as an insurance sales representative. In 1963, Frost moved to Morgan City, Louisiana, where he sold insurance for over thirty years for Metropolitan as part of its Lafayette, Louisiana sales district. Frost had a very successful sales career and received numerous company awards for sales excellence.
During the course of his employment at Metropolitan, Frost engaged in certain practices which were technically against Metropolitan policy, but which were regularly used by many persons on the sales force of the Lafayette district, and which were known to and allowed by management. The first of these practices is referred to as "piggybacking" which consists of removing the cash proceeds from an insured's policy and using it to purchase a larger policy for that insured. A second practice, "brokering," occurs when a representative employed by one insurance company obtains insurance for a customer from another company with whom the representative also has a license.
In June of 1983, John E. Schmidt (Schmidt) became the district sales manager of the Lafayette district. During his tenure, Schmidt advised the sales force that the levels of piggybacking and brokering had to decrease in order to conform with limits acceptable to Metropolitan policy. The record reflects that Schmidt and Frost had at least one individual meeting, in March of 1985, to discuss ways to reduce the high percentages of piggybacking in Frost's accounts; but there is no evidence in the record that the two men ever specifically discussed Frost's brokering practices. When given the option, certain Lafayette district sales representatives resigned or retired from Metropolitan rather than give up their licenses with other companies, whereas others chose to give up all other licenses and to sell exclusively for Metropolitan. It is notable, however, that piggybacking and brokering did not cease entirely.
In April of 1985, Frost severely injured his ankle in a non-employment related accident and was required to take disability leave, which lasted for approximately one year. While on disability, Frost continued to generate insurance sales for Metropolitan, as well as for other companies with which he was licensed. Shortly before returning from disability leave, Frost was approached by Alfred Buteau (Buteau), a Metropolitan sales manager, who asked Frost to give up his licenses with other insurance companies, and to transfer to Buteau's sales staff from his current position on another sales manager's staff. Frost agreed to the arrangement, and on February 6, 1986, letters were sent to Old Republic Life Insurance Company, National Fidelity Life Insurance Company, Life of Virginia, and American Agency Life Insurance Company, requesting that Frost's licenses be canceled immediately. Because Frost made a decision to retire from Metropolitan rather than return to work, he never actually transferred to Buteau's staff.
Before returning from disability leave, Frost contacted the district office and told *709 Schmidt's secretary, Deann Trahan (Trahan), that he wanted to take some accrued vacation leave. By letter dated April 25, 1986, Schmidt denied Frost's request due to the length of time he had been out on disability leave. Frost then wrote a letter to Schmidt indicating his desire to retire from Metropolitan effective April 14, 1986. In response, Schmidt notified Frost, on May 2, 1986, that because all vacation had to be exhausted prior to retirement, he was approving Frost's prior request for vacation as of April 14, 1986.
During the week of April 28, 1986, and at the request of Schmidt, an audit and special investigation of the accounting and underwriting activities of Frost was completed by Dannie R. Holland (Holland), a general supervisor of accounts with Metropolitan. According to Holland's audit report, Frost had replaced several Metropolitan policies with policies from other insurance companies. Additionally, while on disability, Frost placed several universal life policies with Metropolitan, but did so in such a manner as to avoid restrictions on the amount of commission he would receive from the transaction. On April 30, 1986, Schmidt telephoned Frost and requested that he come in to discuss the audit; however, Frost refused.
By letter dated June 12, 1986, Schmidt informed Bill Goggans, an agency vice-president in Metropolitan's New Orleans regional office, of the results of the Frost audit and requested that Frost be terminated rather than allowed to retire. By letter dated July 15, 1986, Frost was notified of his termination. By letter dated August 13, 1986, Frost requested an explanation for his termination. In his response dated August 25, 1986, Schmidt informed Frost that his employment had been terminated "because [he] replaced Metropolitan insurance with insurance issued by another insurance company."
Because Frost was fired rather than allowed to retire, the pension benefits he received upon leaving Metropolitan were substantially reduced. According to the testimony of Leonard Biederman, a senior benefits consultant with Metropolitan, because Frost was fired, his monthly benefits were lower, he was no longer eligible for certain life insurance and medical benefits provided by Metropolitan to retired employees, and his spouse was no longer eligible for monthly survivor income benefits in the event of Frost's death.

ACTION OF THE TRIAL COURT
After being fired, Frost filed suit against Metropolitan and several individuals in the Sixteenth Judicial District Court, Parish of St. Mary, Louisiana, seeking to recover his full pension benefits, punitive damages, and damages for defamation and slander. His benefits claim was based on § 1140 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.[1] Metropolitan reconvened to collect amounts lost as a result of Frost's piggybacking and brokering activities while employed at Metropolitan. At the close of his case at trial, Frost dismissed all claims except the ERISA claim against Metropolitan.
After a trial conducted on October 25, 1991 and December 3, 1991, the record remained open for depositions and the filing of post-trial briefs until July 27, 1992. On November 19, 1992, the trial court rendered judgment in favor of Frost and against Metropolitan for past health benefits, past retirement benefits, reinstatement of health benefits, retirement benefits, and life insurance benefits, and attorney fees, with legal interest on all sums awarded from the date of judicial demand until paid. Metropolitan was also cast with all costs of the proceedings. Metropolitan's reconventional demand was also dismissed.[2]
Following the denial of its motion for new trial, Metropolitan suspensively appealed the judgment, claiming that the trial court erred in finding that Metropolitan violated § 1140 of ERISA by (1) inferring that Frost had *710 established a prima facie case of discrimination, (2) in holding that Metropolitan treated Frost differently from similarly situated agents, (3) in holding that Metropolitan's valid reason for firing Frost was pretextual, and (4) in awarding past health benefits, reinstating future health benefits, reinstating full life insurance benefits, awarding past retirement benefits, reinstating future retirement benefits, and awarding attorney fees.

ERISA
Under § 1140 of ERISA, it is unlawful for any person to discharge a participant in its ERISA employee benefit plan for the purpose of interfering with the attainment of any right to which the participant may become entitled under the plan. Under § 1140, a claimant need not show that the sole reason for his termination was to interfere with his pension rights, but rather that it was a "motivating factor" in his employer's decision. Humphreys v. Bellaire Corporation, 966 F.2d 1037, 1043 (6th Cir.1992). Plaintiff's initial burden is to establish a prima facie case of unlawful termination. The nature of the plaintiff's burden of proof at the prima facie stage is de minimis. Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988). Once the plaintiff presents a prima facie case, the employer is required to dispel the inference of discrimination by articulating a legitimate, non-discriminatory reason for the termination. Humphreys 966 F.2d at 1043; Dister 859 F.2d at 1115. If the employer comes forth with a legitimate reason, the plaintiff must either prove that the interference with pension benefits was a motivating factor in the employer's action or prove that the employer's proffered reason is unworthy of credence. Humphreys 966 F.2d at 1043; Dister 859 F.2d at 1115. See also Turner v. Schering-Plough Corporation, 901 F.2d 335, 347 (3d Cir.1990).
The de minimis burden of proving a prima facie case of discrimination requires that Frost show that he (1) belongs to a protected group, (2) was qualified for the position involved, and (3) was discharged under circumstances that give rise to an inference that the prohibited intent was present. Turner 901 F.2d at 347; Dister 859 F.2d at 1114-1115. In his written reasons for judgment dated August 20, 1992, the trial court does not specifically state that Frost made a prima facie showing that Metropolitan fired him for the purpose of interfering with his attainment of pension benefits. However, this finding can be inferred, since the trial court ultimately found a violation of § 1140 by Metropolitan. In any event, the circumstances surrounding plaintiff's termination are sufficient to give rise to an inference of discrimination. Because § 1140 of ERISA protects those employees who have an opportunity to attain rights in a covered benefit plan, plaintiff is in a protected group. Further, the record contains considerable evidence that Frost was qualified for his position. He had over thirty years of experience and was the recipient of numerous sales awards during his career. Finally, Metropolitan chose to discharge Frost rather than to allow him to retire which resulted in substantial savings in pension benefits to Metropolitan. These facts indicate that Frost met the burden of proving a prima facie case of unlawful termination.
Next, the trial court found that Metropolitan carried its burden of coming forth with a legitimate, non-discriminatory reason for firing Frost. According to the trial court,
Metropolitan had ample reason to discharge Frost based on the irregularities discovered in the auditor[`]s investigation. Policies which were rewritten by Frost with another insurance company was (sic) clearly detrimental to the interests of Metropolitan Life. There is no doubt that the piggybacking scheme reduced income to Metropolitan Life. These activities on a large scale could do substantial damage to an insurance company. It was certainly in the best interests of Metropolitan Life to do whatever was necessary to curtail these activities. It appears that defendant was in the process of purging itself of these problems. In fact, singling out one employee, to be made an example of, by discharging him for engaging in these activities seem[s] appropriate under these circumstances.
*711 However, the trial court clearly went on to find that the above reason was pretextual, and that Metropolitan's primary motivation for firing Frost was to deprive him of good standing under the retirement plan, thereby reducing his pension benefits, as a means of penalizing him for his activities and for his allegiance to competitors. Contrary to Schmidt's testimony, the trial court found that,
[i]t is also without question that John Schmidt knew the implications of his action in denying [Frost's] retirement request and substituting a discharge notice. Obviously, Frost's retirement benefits would be affected by this move. Since Frost would leave Metropolitan Life by virtue of his retirement, the primary motivation for firing him instead seems purely punitive. Among the punitive results was that his retirement benefits would be reduced, along with the stigma of an unfavorable discharge.
Of particular importance to the trial court was the timing of Frost's termination. The trial court found that "[i]f Metropolitan had grounds for firing Frost and desired to do so, it should have done so prior to a request by Frost to retire." The trial court found that Frost notified his employer of his intent to retire on April 14, 1986, and that on April 28, 1986, Schmidt instructed Holland, the auditor, to investigate Frost's work practices. During his trial testimony, Schmidt denied that his intent to audit Frost formed after Frost requested retirement. He claimed that he began his own personal investigation into Frost's activities in late February or early March of 1986. Schmidt also testified that he first discussed the possibility of firing Frost with Goggans, the Metropolitan vice-president, as early as late March or early April of 1986, and that the June 12, 1986 letter recommending Frost's termination was not the first communication between them regarding Frost's situation. However, Schmidt was unable to point to any evidence which documented his investigation during March or April.
Deann Trahan, Schmidt's secretary, testified that she first learned of the Frost investigation when Schmidt instructed her to telephone some of Frost's policyholders to determine why their policies were no longer with Metropolitan. Although she could not remember the date of these calls, nor could she document that the calls had been made, Trahan testified that the calls were made before Frost returned from disability leave.
Dannie Holland, the auditor, testified at the trial that he was first asked to look into Frost's work practices on April 16, 1986. However, this testimony is contrary to his earlier deposition testimony wherein Holland stated that the audit request was made by Schmidt two or three days after April 28, 1986.
Also of considerable importance to the trial court's decision is the fact that no other Lafayette district sales representative was fired for engaging in "similar work-related transgressions" to those used by Frost. Metropolitan argues on appeal that Frost was the only representative actually moving existing Metropolitan policies to other companies, and that this practice is different from either piggybacking or brokering. A careful reading of the trial court's reasons demonstrates that the court was aware of the distinction between the activities of Frost and the other sales representatives, but that the distinction did not warrant firing Frost while other representatives were given the option to retire from Metropolitan or to give up their licenses with other companies.

STANDARD OF REVIEW
When reviewing a trial court's factual findings in a case based on § 1140 of ERISA, an appellate court accepts the trial court's findings unless they are clearly erroneous or influenced by an incorrect view of the law. Olitsky v. Spencer Gifts, Inc., 964 F.2d 1471, 1479 (5th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993). This standard of review for factual findings is akin to the manifest error-clearly wrong standard employed by appellate courts under Louisiana law. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993). The issue to be resolved by a reviewing court is not whether the trial court was right or wrong, but whether its conclusion *712 was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the trial court, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart, 617 So.2d at 882.
In order to reverse a trial court's factual findings, the documents or objective evidence in the case must so contradict the evidence relied on by the trial court that a reasonable factfinder would not credit the evidence. Nonetheless, the reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart, 617 So.2d at 882-883.
The only evidence presented by Metropolitan to contradict the trial court's finding that the intent to fire came after Frost's request to retire is the subjective testimony of Schmidt and Trahan indicating that the investigation began well in advance of and independent of Frost's decision to retire; however, Metropolitan presented no objective evidence to support the testimony of its employees. A thorough review of the record demonstrates that no such evidence exists.
The trial court chose not to give credence to the testimony of Schmidt and Trahan, and reasonably inferred from the proximity of the date of firing to the date of Frost's request to retire that Metropolitan intended to deprive Frost of his pension benefits. Further, the trial court found that the prohibited activities engaged in by Frost did not warrant that he be subjected to more severe measures than others who had also engaged in prohibited conduct. After a thorough review of the record, we cannot say that the trial court's conclusions were unreasonable or that objective evidence in the record so contradicts the trial court's findings that a reasonable factfinder would not credit the evidence upon which the lower court relied.
For the foregoing reasons, we affirm the judgment of the trial court. All costs of the appeal are assessed against Metropolitan.
AFFIRMED.
NOTES
[1] There is no dispute that Metropolitan's benefits plan qualifies as an "employee welfare benefit plan" within the meaning of ERISA, thus bringing Frost's claim within the purview of this legislation. Further, the trial court found that it had jurisdiction to hear the ERISA claim, and this issue was not raised on appeal.
[2] The dismissal of Metropolitan's reconventional demand was not assigned as error on appeal.