Charles E. HASTIE, Plaintiff,

v.

**J.C. PENNEY COMPANY, INC., Defendant.**

No. 88–CV–1062A.

United States District Court, W.D. New York.

Oct. 28, 1994.

**1020**

Falk & Siemer, Buffalo, NY (Donald G. McGrath, of counsel), Williams, Glover, Walton & McAlilly, Meredian, MS (Stephen L. McAlilly, of counsel), for plaintiff.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY (Paul I. Perlman, of counsel), Nicholas A. O'Kelly, J.C. Penney Company, Inc., Legal Dept., Dallas, TX, for defendant.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on December 17, 1991. On November 20, 1992, defendant filed a motion for summary judgment and on February 4, 1993, plaintiff filed a cross-motion for summary judgment on defendant's counterclaims. On January 25, 1994, Magistrate Judge Foschio filed a Report and Recommendation recommending that defendant's motion for summary judgment on the amended complaint be denied; that defendant's motion for partial summary judgment on its counterclaims be denied; that plaintiff's motion for summary judgment on the counterclaims be denied as untimely; and that summary judgment on defendant's counterclaims be granted *sua sponte* in favor of plaintiff.

On February 8, 1994, defendant filed objections to those portions of the Report and Recommendation recommending denying its motion for summary judgment as to plaintiff's claim under § 510 of ERISA, 29 U.S.C. § 1140 and recommending denying its motion for summary judgment based on plaintiff's failure to mitigate damages. Plaintiff filed a response thereto on February 22, 1994.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendant's motion for summary judgment on the amended complaint is denied, and defendant's motion for partial summary judgment on its counterclaims is denied. Further, the Court denies plaintiff's motion for summary judgment on the counterclaims as untimely, and grants summary judgment *sua sponte* on defendant's counterclaims in favor of plaintiff.

This matter is referred back to Magistrate Judge Foschio for further pretrial proceedings.

IT IS SO ORDERED.

REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

## JURISDICTION

This matter was referred to the undersigned by the Hon. Richard J. Arcara on December 17, 1991 for report and recommendation on any dispositive motions. The matter is presently before the court on Defendant's motion for summary judgment, filed November 20, 1992, and Plaintiff's cross-motion for summary judgment on Defendant's counterclaims, filed February 4, 1993.

## BACKGROUND

Plaintiff, Charles E. Hastie, initially filed this action in New York State Supreme Court, Erie County, on August 29, 1988. Defendant, J.C. Penney ("Penney") removed the action to this court on October 3, 1988. Hastie filed an amended complaint on June 16, 1989, and Penney filed an amended answer with counterclaims on June 30, 1989. Hastie has asserted two claims: a claim for unlawful age discrimination under New York State Executive Law § 296(1)(a), and a second claim under Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. Penney has asserted three counterclaims for fraudulent misrepresentation, breach of fiduciary duty, and unjust enrichment.

Following extensive discovery, Penney filed a motion for summary judgment on Hastie's causes of action, and for partial summary judgment on liability on Penney's counterclaims on November 20, 1992. In response, on February 4, 1993, Hastie filed a motion for summary judgment on Penney's counterclaims. Oral argument on the matter was held on March 25, 1993.

For the reasons as set forth below, Defendant's motion for summary judgment on the amended complaint should be DENIED. Defendant's motion for partial summary judgment on Defendant's counterclaims should be DENIED. Plaintiff's motion for summary judgment on Defendant's counterclaims should be DENIED as untimely, however, the court *sua sponte* recommends that Defendant's counterclaims be dismissed.

## FACTS

Hastie began his employment with Penney, a large retailer of consumer merchandise, as a sales trainee in 1954. (TH. 109).[1] In February, 1955, Hastie was promoted to the position of Department Manager, Men's Division, at Penney's Germantown, Pennsylvania store. (TH. 110). Eventually, Hastie was promoted to Floor Manager at that store. In 1960, Hastie took a position as an Assistant Store Manager/General Merchandise Manager at Penney's store in Richmond, Virginia. (TH. 113). Hastie was then promoted, in 1962, to Sales and Merchandise Manager of a "B" Group, responsible for supervising the types of merchandise offered at three stores. (TH. 124). He was subsequently promoted, in 1965, to Merchandise manager of an "A" Group, responsible for supervising the types of merchandise offered for sale at approximately twenty stores. (TH. 126). In 1967, Hastie became Sales and Merchandise Manager of the "A" Group, (TH. 127), and, in 1968, Hastie was promoted to Store Manager at Penney's Germantown, Pennsylvania store. (TH. 128). In 1971, Hastie became the Store Manager at a larger Penney's store located in Lakewood, New York, (TH. 138–139), and, in 1974, Hastie was promoted to Store Manager at Penney's West Seneca, New York store, a store approximately 2½ times larger than the Lakewood store. (TH. 147). In 1982, Hastie became the leader of the District's Women's Fashion Team, responsible for planning and coordinating meetings with other managers to discuss buying strategies. (TH. 236). In 1984, Hastie was offered the position of Store Manager at the Eastern Hills Mall store in

---

1. TH. references are to the page numbers of the transcript from the deposition of Plaintiff, Charles Hastie, held on May 4 and 5, 1989.

Amherst, New York, but he declined the offer. (TH. 219–221).

Throughout this employment history, Hastie's performance was favorably appraised, and, as a result, he received salary increases and promotions. (TH. 112–113, 116, 125, 127–128). Penney had a rating system for evaluating store managers, with a "1" being the highest rating, and a "5" being the lowest. Additionally, performance appraisals of store managers were also reviewed by the Regional Personnel Manager and the Regional Vice President. (TM. 271).[2] Hastie was evaluated as a "2" (above average) and a "3" (average) at different times. (TH. 137, 144, 154–155, 158, 209). Certain later performance appraisals contained notations regarding Hastie's age as of the date of the performance review.

For the first year of Hastie's employment as the Store Manager at Lakewood, he was supervised by Donald Mustaine, the district manager. (TM. 171). Mustaine appraised Hastie's performance at a level "3" at that time. (TH. 144). After Hastie transferred to the West Seneca store, Karl Scheffer became Hastie's district manager in 1979. (TH. 177). Prior to Scheffer's arrival, Hastie had been given an appraisal of "4" (below average), (TH. 178), however, Hastie claimed that, after Scheffer's inspection of the West Seneca store, he told Hastie that, "I was given some very bad and misleading information about you ... [but] I'm very, very pleased with the way the store is going, I'm very happy to have you in my district and I look forward to working with you." (TH. 179, 183). In 1980, 1981, 1982, 1983, and 1984, Scheffer gave Hastie a "2" rating. (TH. 210, 214, 222, 224). During Hastie's performance appraisal in 1984, Scheffer criticized Hastie's handling of markdowns in the store, i.e. merchandise sale priced for quicker sale, stating that he wanted lower store mark-downs. (TH. 226).

Earlier, in 1984, Scheffer offered Hastie the Store Manager position at Eastern Hills Mall, stating that Hastie had worked very

hard throughout his career, and that Hastie should manage a store that was easier to manage than the West Seneca store since he "had only a couple of years to go to retirement." (TH. 219). At that time, Hastie was 56 years of age. (TH. 219). Hastie, however, did not plan to retire at 60 years old as Scheffer apparently assumed. (TH. 220).

In the fall of 1984, Mustaine became employed as Penney's District Manager in the district in which the West Seneca store was located, replacing Scheffer. (TH. 248). In his first appraisal of Hastie for 1984, Mustaine appraised Hastie's performance as a "3," (TH. 230), stating that Hastie needed to bring his inventories in line with company guidelines. (TH. 232–233). Mustaine informed Hastie that he did not want an overstocked store, and that correcting the situation would be a priority. (TH. 299).[3]

In 1985, Hastie claimed that a pattern of harassment against him began. Members of Mustaine's management team began visiting Hastie at his store for routine inspections. (TH. 257). Salary increases due to Hastie were not processed timely. (TH. 277). Mustaine would call Hastie, asking him technical questions, expecting immediate answers. (TH. 278). Mustaine would also telephone Hastie, stating that he would be coming to the store to see him, and then would not appear. (TH. 295). Additionally, sometime in 1985, Bill Columbo, the operations manager for the district, informed Hastie that Mustaine had instructed him to investigate the buying practices in Hastie's store, and to report directly to Mustaine any of his findings. (TH. 261–262).

In December, 1985, a week before Christmas, the West Seneca area was hit by a significant snow storm, causing the store to virtually close, resulting in a high overstock of inventory because of the lack of Christmas sales. (TH. 170). During the same month, Mustaine visited the store, touring the store with Hastie, the merchandise manager, and the general merchandise manager, becoming,

---

2. TM. references are to the page numbers of the transcript of the deposition of Donald E. Mustaine, held on July 12, 13, and 14, 1989, and August 22 and 23, 1989.

3. An overstocked store is one where the book inventory on hand is in excess of the store's inventory allowance. (TM. 302).

according to Hastie, highly critical of many items, especially the high overstock. (TH. 281). Mustaine characterized this meeting with Hastie as an "emotional time," although he claimed that he could not recall being "unduly critical." (TM. 358). On December 26, 1985, Mustaine removed Hastie from his position as leader of the District Women's Fashion Team, replacing him with another manager. (TH. 241–242, TM. 427). Despite this allegedly critical behavior, Mustaine originally rated Hastie at a level "2" for 1985 in his performance appraisal, although Hastie remained overstocked in inventory. (TM. 261, 281). However, this appraisal was changed to a level "3" after discussion with Karl Scheffer, the Regional Personnel Manager, and Richard C. Sherwood, the Regional Vice President. (TM. 485–486).

According to Hastie, Mustaine continued to harass him in 1986 on an intensified basis. (TH. 297). Hastie claimed that Mustaine's management staff, during visits to the store, would always ask Hastie what his retirement plans were. (TH. 257). In response, Hastie, understanding that, in the Penney company, age 60 had been the normal retirement age, (TH. 260), requested a printout from the benefits department regarding what his potential retirement benefits would be, (TH. 260), however, Hastie did not have plans to retire. (TH. 260). When evaluating Hastie's salary merit increase in October, 1986, after review with Scheffer and Sherwood, it was decided, because of the "chronic overstocks" in Hastie's store, to give Hastie a merit increase based on a "3" rating. (TM. 284). Mustaine actually held up the implementation of Hastie's raise, as, although Hastie had corrected the overstock problem, Mustaine wanted to make sure that "we didn't get back into that problem again." (TM. 296). Mustaine conceded that the date of Hastie's salary increase did not conform to the Penney company guidelines. (TM. 298).

Hastie had an overstock problem in the store prior to Mustaine's arrival in 1984. (TH. 300, TM. 367). Mustaine spent significant amounts of time discussing this problem during his visits to the store. (TH. 303, TM. 370, 375). However, for a five month period during 1985, the situation improved, and the store was actually understocked. (TH. 304, TM. 347). However, after the December, 1985 snowstorm, the store became heavily overstocked again as a result of the lack of Christmas sales volume. In fact, Mustaine estimated that, because of the storm, the store lost approximately $500,000—$600,000 in sales. (TH. 171). Mustaine, however, continued to criticize Hastie for his high inventory. Mustaine instructed Hastie to get the inventories "back in line." (TM. 363). As Penney conducts their annual inventory at the end of January, Hastie assumed that he had only forty days to get rid of high amounts of seasonal inventory which had not been sold due to the storm. (TH. 171). At the time, Hastie was overstocked by a least one million dollars of inventory. (TH. 172, TM. 348). Hastie began to mark-down the merchandise, stopping at a certain point in December 1985 as he thought Mustaine did not want any more mark-downs to be taken in December, and then taking further mark-downs in January, February, and March, 1986 when he remained heavily overstocked. (TH. 173–175, 351–352, 367). In contrast to Hastie's recollection, Mustaine stated that he did not recall telling Hastie that he had taken enough mark-downs in December, 1985, and not to take any more in that period. (TM. 365).

Hastie eventually successfully reduced his inventory, however, to accomplish this goal, he "floated" additional mark-downs on the merchandise, i.e., when he reached the budgeted amounts of mark-downs for a period, he did not tabulate any further mark-downs, but, rather, carried those additional mark-downs into the next period. (TH. 353). By not timely reporting these mark-downs during the period when they actually occurred, the financial records appeared to state that the marked-down merchandise was being sold at the West Seneca store at the regular retail price rather than the actual sale price. (TH. 370). Hastie admitted that he had been periodically instructed not to float mark-downs, however, he stated that this had been a company-wide practice for quite some time. (TH. 373–375, 385). He also did not consider floating mark-downs to be an intentional distortion of company records, as the mark-downs were not floated between fiscal years.

(TH. 384). Penney, however, apparently considered the floating of mark-downs to be a serious problem, and there was a policy against such practices as stated in a June 6, 1986 memorandum from Sherwood to the Store Managers. *See* Exhibit A, Defendant's Notice of Motion, dated November 20, 1992, (TM. 723, 773). A follow-up memo was sent to the Store Managers from Mustaine on June 19, 1986. *See* Exhibit A, Defendant's Notice of Motion.

In January, 1987, Bill Columbo again visited Hastie at his store, having been assigned by Mustaine to check the store's mark-downs. (TH. 451–452, TM. 541). Columbo informed Hastie that he had discovered the mark-down float, and that he would have to report this information to Mustaine. (TH. 453, TM. 543). In April, 1987, Penney auditors came to the West Seneca store, stating that the store had been randomly selected for a three week audit. (TH. 454). David Miller, the head auditor, mentioned to Hastie that there was a problem with the mark-down cutoff. (TH. 455). While the auditors were still in the store, in May, 1987, two representatives from Penney, William True, the regional loss prevention manager for Penney, (TT. 10),[4] and Don Kinslow, a regional loss prevention representative, (TT. 10), came to see Hastie at his office, stating that Hastie's mark-down float was exorbitant. (TH. 416). True assisted Hastie in preparing a written statement regarding the mark-down situation, however, Hastie now claims that he only wrote the statement under extreme duress. (TH. 420–421). True and Kinslow also met with William Beausoleil, the store's operations manager, who was subsequently accused of altering the store's inventory figures. (TT. 48, TM. 808–810).

A week after this visit, Mustaine telephoned Hastie, requesting that he go to the Pittsburgh, Pennsylvania regional headquarters to meet with Sherwood to respond to a charge of defalcation of company records. (TH. 456, TM. 612). Hastie, contacting Karl Scheffer, was told that he was going to be fired because of the floating mark-down problem, and that the decision was irreversible. (TH. 458). Hastie then asked if he could take early retirement instead of being discharged. (TH. 458–459). Hastie did not make the trip to Pittsburgh, instead taking the offered option of early retirement. (TM. 859). Thereafter, as of May 31, 1987, Hastie retired from his position with Penney. (TH. 459). Upon retirement, Hastie claims that he asked Mustaine why he did not give him any counsel as to what Hastie should do about the mark-down problem, to which Mustaine allegedly responded, "I never give advice to my older managers." (TH. 465).

Aside from Hastie, Mr. True could not recall any store manager being terminated for floating mark-downs. (TT. 17). Penney claims that Hastie's float of over $907,000 in mark-downs over a seven month period was significantly higher than any similar conduct ever discovered. It has not been revealed, however, how this figure was calculated or how it relates as a percentage to the volume of sales and inventory in the store in order to determine the materiality of the floated mark-downs. Beausoleil was also terminated at the same time as Hastie based on charges of altering physical inventory records at the store. (TM. 808). At the time of Hastie's retirement, the operating profits of the West Seneca store were substantially improved, and the store was understocked. (TM. 552). Hastie was 59½ years of age at the time of his retirement. By retiring prior to age 60, Hastie lost eligibility for full pension benefits from Penney. (TS. 110).[5]

## DISCUSSION

Summary judgment will be granted pursuant to Fed.R.Civ.P. 56 when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Net-*

---

4. TT. references are to the page number of the transcript of the deposition of William True, dated January 21, 1991.

5. TS. references are to the page numbers of the transcript of the deposition of Karl Scheffer, held on January 22, 1991.

*burn,* 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of a genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331, 106 S.Ct. at 2556.

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson, supra,* at 255, 106 S.Ct. at 2513; *Rattner, supra,* at 209.

In this case, the claim under the New York Human Rights Law is a claim based on New York law, in this court's jurisdiction based upon the diversity of the parties. In a diversity action, because New York is the forum state, New York's choice-of-law rules will determine which state's substantive law should apply. *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Machleder v. Diaz,* 801 F.2d 46 (2d Cir.1986). The question is, therefore, not what law the federal court would apply, "but what law the New York courts would apply." *O'Connor v. Lee–Hy Paving Corp.,* 579 F.2d 194, 205 (2d Cir.1978), *cert. denied,* 439 U.S. 1034, 99 S.Ct. 639, 58 L.Ed.2d 696 (1978). Under New York's choice-of-law rule, the law of the jurisdiction having the most significant contacts and the greatest interest in the litigation will be applied. *See Index Fund, Inc. v. Insurance Company of North America,* 580 F.2d 1158 (2d Cir.1978); *Cooney v. Osgood Machinery, Inc.,* 81 N.Y.2d 66, 595 N.Y.S.2d 919, 612 N.E.2d 277 (N.Y.1993); *Schultz v. Boy Scouts of America,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (N.Y.1985); *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (N.Y.1972). In this case, as the parties have cited to New York law, the court concludes that the parties agree that New York law should apply.

### 1. *Defendant's motion for summary judgment*

#### (a) *New York State Human Rights Law claim*

Penney claims that it is entitled to summary judgment on the amended complaint on the claim for age discrimination under the New York Human Rights Law, as the evidence has established that Hastie deliberately falsified company records as to markdowns taken at his store, and that there is no evidence of any age discrimination, rather, Hastie was terminated for legitimate, nondiscriminatory business reasons. Additionally, Penney contends that, as Hastie failed to seek new employment following his termination, any claim for back-pay should be cut-off as of the date of Hastie's retirement, and no claim for front-pay should be allowed. As there would then be no allowable damages, the action should be dismissed. Finally, as to the claim under ERISA, Penney claims that Hastie has failed to establish a *prima facie* case under § 510 of ERISA as he has not met his heavy burden to demonstrate a discriminatory discharge.

Hastie claims that Penney's stated reasons for terminating Hastie are pretext, as other store managers were not terminated for floating mark-downs, despite other managers following the same practice. Hastie contends that the reason for his termination was his age, as the other managers who were not dismissed for similar offenses were younger. Hastie states that he has established a *prima facie* case of age discrimination, and, while conceding that Penney has raised legitimate business reasons for Hastie's termination, argues that a jury must determine whether Penney's legitimate business reasons are simply pretextual.

The standard of proof for a claim under the New York Human Rights Law, Executive Law § 296 is the same as that of the standard of proof for a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. *Johnson v. Al Tech Specialties Corp.,* 731 F.2d 143, 147 (2d

Cir.1984); *Kaczor v. City of Buffalo,* 657 F.Supp. 441, 446 (W.D.N.Y.1987). In addition, the remedies are the same under both federal and state law, with the exception that, under the state law, recovery for emotional distress is permitted. *Johnson, supra,* at 147.

It is unlawful under the ADEA and the New York Human Rights Law for an employer to discharge or discriminate against an individual because of his or her age. 29 U.S.C. § 623(a)(1); N.Y. Exec. Law § 296. Courts have used two different types of analyses to examine wrongful discharge claims under the ADEA. If direct evidence of age discrimination is presented, an employer can avoid liability if it can establish that it would have taken the same employment action even if it had not considered the plaintiff's age. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794, 104 L.Ed.2d 268 (1989); *Ostrowski v. Atlantic Mutual Insurance Co.,* 968 F.2d 171, 182 (2d Cir.1992). However, if no direct evidence of age discrimination is presented, the courts analyze the claim under the three part test as enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). First, a plaintiff must establish a *prima facie* case of employment discrimination. To make out a *prima facie* case of age discrimination, a plaintiff must show: (1) he was in a protected age group, (2) he was qualified for the job he held, (3) he was discharged, and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination. *Stetson v. NYNEX Service Co.,* 995 F.2d 355 (2d Cir.1993); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983). Upon making such a showing, the burden shifts to the employer to produce evidence that the plaintiff was discharged for a legitimate, nondiscriminatory reason. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The burden then shifts back to the plaintiff where the plaintiff must establish that the employer's reasons for the discharge are merely a pretext for discrimination. *Texas Dept. of Community Affairs, supra,* at 256, 101 S.Ct. at 1095.

In this case, to make out a *prima facie* case of age discrimination, Hastie has shown: (1) that he is within the protected age group, (2) that he was qualified for his position in that he had been employed with Penney since 1954, and specifically as a Penney Store Manager since 1968, a period of almost twenty years at the time of Hastie's termination, and (3) that he was discharged from Penney, taking early retirement only as an alternative to termination. As to the fourth factor, whether Hastie's termination occurred under circumstances giving rise to an inference of age discrimination, Hastie has provided evidence to show that Penney expected and encouraged its Store Managers to retire by the age of 60. Specifically, Hastie offered evidence that established that Penney provided its employees with seminars on retirement and pension benefits, with the calculations at the seminar based on a person's retirement age of 60. Additionally, few, if any, store managers remained in their positions after the age of 60, and, according to Hastie, it was the unspoken practice in the Penney company that its Store Managers would retire at the age of 60. In a discussion with Karl Scheffer, then Hastie's district manager, in 1984 when Hastie was 56 years old, Scheffer attempted to have Hastie take over the management of the Eastern Hills Mall store, stating that it was an easier store to manage than Hastie's West Seneca store, and that Hastie should take advantage of an easier workload in the couple years in which he had left to work. At the time of Hastie's termination, he was 59½ years of age. Hastie was then replaced in his position at the West Seneca store by John Fearnow, a younger employee. Based on the record, the court finds, for the purposes of this summary judgment motion only, that Hastie has established a *prima facie* case of age discrimination.

Penney, however, argues that the sole reason for Hastie's termination was his direct violation of company policy, a legitimate non-age related reason. Penney submitted evidence that, at least since 1976, there had been written directives that store managers were not to float mark-downs. Additionally, in 1986, the year prior to Hast-

ie's termination, a memo was sent to all Penney store managers from Richard C. Sherwood, Penney Regional Vice President, specifically stating that the floating of mark-downs was against company policy. Nonetheless, Hastie floated mark-downs, albeit his stated reason was to lower his inventory as a result of the extreme pressure placed upon him by Mustaine to do so. When it was discovered that Hastie had floated a cumulative total of over $907,000 in mark-downs over a seven month period, Penney states that the decision was made to terminate Hastie. Hastie claims that other store managers were not terminated for similar conduct. To establish that they have established legitimate business reasons for terminating Hastie, Penney submitted an affidavit from Raymond R. Jacko, Regional Personnel Relations Attorney for the Northeastern Region of Penney, stating that his investigation had revealed three managers between the ages of 40 and 44 who were terminated for the practice of floating mark-downs, and four managers between the ages of 50 and 58 who were not terminated for the same practice. The affidavit also stated, however, that these four identified non-terminated managers were not the only managers who were not terminated for floating mark-downs. *See* Affidavit of Raymond R. Jacko, dated March 11, 1993, at ¶ 5. Additionally, there is evidence in the record that the three managers who were dismissed for this practice had also violated other company policies which, in and of themselves, called for summary dismissal. *See, e.g.,* Plaintiff's Exhibits 23–42 in Opposition to Summary Judgment Motion, Volume 3, No. 30. The court finds, however, that, for the purposes of this summary judgment motion, Penney has provided evidence that its actions were taken for legitimate, non-discriminatory reasons.

However, "simply because an employer has articulated legitimate non-discriminatory reasons for discharging an employee, that alone does not entitle it to a verdict in its favor." *Gilkerson v. Toastmaster, Inc.,* 770 F.2d 133, 135–136 (8th Cir.1985). As stated, the burden shifts to the plaintiff to show that the legitimate business reasons given for the discharge are simply pretext for discrimination.

Penney cites *Summers v. State Farm Mutual Auto Insurance Co.,* 864 F.2d 700 (10th Cir.1988), and *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359 (7th Cir.1988), for the proposition that violations of company policy, *i.e.,* the falsification of company records, have been held to be legitimate, non-discriminatory reasons for discharging an employee, and, as a result, Hastie's misconduct precludes any relief. In *Summers,* the plaintiff was found to have continually falsified company records by forging signatures on supporting documents and by falsifying various medical and pharmacy bills submitted to State Farm as supporting documentation. Despite warnings that future incidents would result in dismissal, the plaintiff continued his practice. The court held that where the plaintiff continued to falsify documents, even after repeated warnings, he was not entitled to relief, even if his termination by State Farm was motivated in part by the plaintiff's age and religion. In *Mechnig, supra,* the plaintiff salesman was discharged after over thirty years of service when it was shown that the plaintiff continually submitted false time cards, even though the plaintiff, as an outside salesman, asserted that it was common for all outside salesmen to submit time cards claiming a 40 hour work week even if they worked more or less hours. The plaintiff in *Mechnig* was found not to have submitted any evidence that the Sears time card falsification policy was applied by Sears in a discriminatory manner. The court in that case noted that, "while it is up to an individual employer to decide what disciplinary action cheating deserves, the criterion for making such a decision must be 'applied, alike to members of all races,' and employment discrimination acts are violated if ... it is not." *Mechnig, supra,* at 1366 (quoting *Friedel v. City of Madison,* 832 F.2d 965, 974 (7th Cir.1987) (quoting *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 278–80, 96 S.Ct. 2574, 2577–79, 49 L.Ed.2d 493 (1976))). These cases are distinguishable from the instant case. In *Mechnig,* no evidence of age discrimination in Sears' enforcement of company policies was established. And, in *Summers,* State Farm was unsuccessful on an earlier summary judgment motion, despite the evidence of the plaintiff's falsification of

company records, and only succeeded on the merits after they acquired new evidence that the plaintiff had actually falsified over 150 documents, thereby establishing that even if age had not been considered, plaintiff would have been discharged. There was also no evidence submitted that other individuals had been accused of similar conduct, but had been treated differently.

■ In this case, Hastie has submitted documentation that other store managers were treated differently after allegedly violating the same company policy as did Hastie. Penney has not disputed this fact, in fact, it has submitted evidence that this is indeed the case. Simply violating a company policy, without more, will not suffice to defeat a claim of age discrimination prior to a jury determination. *See, e.g., Klein v. Stop–N–Go,* 869 F.2d 899 (6th Cir.1987) (directed verdict against store manager who violated company policy by allowing her husband to make store bank deposits reversed where court held that there was ample evidence to go to the jury on an age discrimination claim so that the jury could determine whether the defendant's actions in enforcing the violation of company policy was a pretext for discrimination); *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404 (8th Cir.1987) (where trial court granted judgment n.o.v., appeals court held that there was sufficient evidence to support jury verdict for employee on age discrimination claim even where defendant claimed that plaintiff had submitted unauthorized charges to his expense account as the reasons for his discharge). *See also Blake v. J.C. Penney Co.,* 894 F.2d 274, 279 (8th Cir. 1990) (appeals court reversed judgment n.o.v. for the employer, stating that "employers, while free to establish standards for employee conduct, must enforce such criteria in a non-discriminatory manner").

■ Penney also argues that the court should grant summary judgment as Hastie has failed to mitigate his damages. Specifically, Penney claims that, as Hastie has not searched for a comparable position with another retailer, he is now precluded from any award for front or back pay, relying on a case from the Fifth Circuit, *Johnston v. Harris County Flood Control District,* 869 F.2d 1565 (5th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990) (where employee has failed to exercise reasonable diligence in finding comparable employment, defendant employer is relieved of its burden to show that comparable employment existed). In the Second Circuit, a plaintiff alleging employment discrimination has a duty to use reasonable diligence in finding other suitable employment. *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992). The plaintiff "need not accept employment that is not comparable to his previous position; but if he accepts less prestigious work, his earnings from that job are subtracted from his back pay award." *Clarke, supra,* at 1152. However, the employer bears the burden of proving that suitable work existed, and that the employee did not make reasonable efforts to obtain work. *Clarke, supra,* at 1152. In this case, while it does not appear that there is evidence that Hastie sought comparable work, Hastie has submitted evidence stating that the major retailers in the Buffalo area do not hire store managers from outside the company, but, rather, only promote from within. Penney has not come forward with evidence that comparable work did exist for Hastie, but only stated that Hastie did not make reasonably diligent efforts to obtain such work. The court finds that a genuine issue of material fact remains as to whether suitable work was available for Hastie, and whether Hastie simply refused to take such comparable positions.

■ In summary, based on the above discussion, the court concludes that, as Hastie has raised sufficient evidence of Penney's encouragement that store managers retire at age 60, and its alleged toleration of violation of company policy in floating mark-downs by other store managers, Hastie's evidence submitted in opposition to Penney's motion sufficiently demonstrates that there are genuine issues of material fact as to the question of whether Penney's decision to terminate Hastie in May, 1987 was substantially related to his age or not, and whether Penney's asserted business reasons for terminating Hastie were legitimate or were simply pretext. Additionally, there remains questions

of fact regarding Hastie's ability to find comparable employment. Accordingly, Penney's motion for summary judgment on the New York State Human Rights Claim should be DENIED.

### b. *ERISA Claim*

Hastie has also raised a claim under ERISA that he was discriminatorily discharged so as to lessen the amount of employee benefits he received upon his termination or retirement.

▮▮▮ Under Section 510 of ERISA, it is "unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan]...." 29 U.S.C. § 1140. Section 510 is designed to prevent employers from discharging their employees in order to prevent them from obtaining vested pension rights. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988). There is no cause of action under ERISA where the loss of pension benefits is only a consequence of, but not a motivating factor behind, a termination of employment. *Dister, supra*, at 1111. The same standard of proof applies in proving a discrimination claim under Section 510 of ERISA as in other age discrimination actions. *Dister, supra.*

▮▮▮ It is undisputed that, by severing Hastie's employment relationship with Penney prior to age 60, Hastie was not eligible for full pension benefits. As the court has concluded above that genuine issues of material fact remain as to Hastie's age discrimination claim under the New York State Human Rights Law, the court also finds that, for the same reasons, the same issues of material fact remain as to Hastie's claim under Section 510 of ERISA. Therefore, the court finds that Penney's motion for summary judgment on Hastie's ERISA claim should be DENIED.

### 2. *Summary Judgment on Defendant's Counterclaims*

In its amended answer, Penney asserted three counterclaims: (1) fraudulent misrepresentation, (2) breach of fiduciary duty, and (3) unjust enrichment. Penney now seeks summary judgment on these claims on the basis that, since Hastie has admitted floating mark-downs, which resulted in a misstatement of Penney's monthly financial statements upon which Penney claims Hastie's compensation was based, Hastie is liable to Penney as a dishonest employee. Hastie filed a summary judgment motion seeking to dismiss Penney's counterclaims on February 3, 1993, on the ground that there was no basis to raise these counterclaims except for the purpose of harassing Hastie, however, Penney noted that the motion was untimely, as the deadline for filing dispositive motions had expired on November 20, 1992, and no further extension was granted.

The evidence in this case establishes that Hastie floated mark-downs over a seven month period. According to Hastie, while the mark-downs were floated month to month, there was no carryover into a new fiscal year. Therefore, Hastie claims, as his compensation was based on yearly profit and loss statements, he never was compensated based on inflated figures, and, accordingly he did not receive unearned salary increases or incentives as contended by Penney, and Penney did not suffer any injury or damages.

▮▮▮ To establish a claim for fraudulent misrepresentation, a claimant must show the uttering of a known false misrepresentation made for the purpose of inducing another to act upon it, and that the other party justifiably relied upon the statement and, as a result, suffered injury or damage. *See Clanton v. Vagianelis*, 187 A.D.2d 45, 592 N.Y.S.2d 139, 140 (App.Div. 3rd Dep't.1993). A claim for breach of fiduciary duty arises where acts of misconduct are done by a person entrusted in a fiduciary relationship, *i.e.* "one founded upon trust or confidence, reposed by one person in the integrity and fidelity of another." *See Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 529 N.Y.S.2d 279, 283 (App.Div. 1st Dep't.1988). A claim for unjust enrichment arises where one party holds property under such circumstances that in equity and good conscience he ought not to retain it. *See Ptachewich v.*

*Ptachewich,* 96 A.D.2d 582, 465 N.Y.S.2d 277, 278–279 (App.Div.2d Dep't.1983). In this case, Penney claims damages based on all three theories as it asserts that Hastie's compensation levels, based on incentive payments, would have been different but for his actions in floating mark-downs.

■ Compensation for fully completed past services is properly paid to an employee unless there is a failure of performance that is substantial, material, and strikes at the very essence of the employment relationship. *See Russ v. Minuteman Optical Corp.,* 99 A.D.2d 632, 472 N.Y.S.2d 198, 200 (App. Div.3rd Dep't.1984). In *Falcone v. EDO Corporation,* 141 A.D.2d 498, 529 N.Y.S.2d 123 (App.Div.2d Dep't.1988), the plaintiff sued his employer on a breach of contract theory for compensation for overtime work. The defendant employer refused to pay the plaintiff because of his alleged failure of performance. The court held that the fact that the plaintiff had worked for the employer for nearly forty years, and was consistently promoted, indicated that there was no failure in performance, and that, therefore, the plaintiff's claim for compensation could not be defeated. *Falcone, supra,* at 125.

It is undisputed in this case that Hastie floated mark-downs during 1986 and 1987. Hastie has conceded this conduct, although he stated that he did not believe that he had falsified any company documents, and that floating mark-downs was a company-wide practice. The issue is, therefore, whether Hastie's conduct in floating these markdowns makes him liable to Penney under the legal theories which Penney has asserted.

In this case, Hastie was employed by Penney for a period of thirty-four years during which time he was consistently promoted to better positions in larger stores. Penney has not submitted any evidence to establish that the mark-down policy within the stores was at the essence of the employment relationship between Hastie and Penney. Further, there is no evidence that Hastie purposely fraudulently misrepresented facts to Penney, breached his fiduciary duty to Penney, or was compensated unjustly at Penney's expense in a manner that went to the heart of his employment relationship with Penney.

Rather, Hastie was instructed to bring his large inventory down to acceptable levels, and to do so quickly. Hastie, apparently, assumed he was following corporate direction by lowering his inventory in a way he thought was proper. While it may be said that Hastie exercised poor business judgment, it does not appear, on the facts presented, that Hastie purposely intended to defraud Penney. The court notes that Penney has not asserted any actual injury, but, rather, has only claimed that Hastie would have had a different compensation level if the mark-downs had been appropriately reported. Penney has not submitted any evidence as to how Hastie's compensation level would have varied.

Counterclaims have been asserted in employment discrimination cases where the facts warrant such claims. *See, e.g., Finley v. Empiregas, Inc. of Potosi,* 975 F.2d 467 (8th Cir.1992) (jury found for employee in employment discrimination case, but also found for employer on counterclaims for conversion and purchasing items at discounted employee prices). However, this does not appear to be the type of case to warrant such claims. As stated above, Hastie's possible use of poor business judgment in this one area of his job performance does not strike at the very heart of his employment relationship with Penney such that Penney should be allowed to recover compensation for fully completed past services. Accordingly, Penney's motion for partial summary judgment as to liability on its counterclaims should be DENIED.

The court agrees with Penney that Hastie's motion for summary judgment on the counterclaims was untimely, and, as such, the court will not consider Hastie's motion. Rule 16 scheduling orders are to be followed unless appropriate extensions are granted. As Hastie did not request any such extension, his motion, filed more than two months after the extension for filing dispositive motions is untimely.

■ However, district courts possess the power to enter summary judgments *sua sponte,* as long as the losing party was on notice that such party was required to come

forward with all necessary evidence. *Celotex v. Catrett, supra,* at 326, 106 S.Ct. at 2554; *McCranie v. 40 Hartford Ave. Realty Corp.,* 1993 WL 525506 at *2 (S.D.N.Y.1993). By virtue of the fact that Hastie did file a summary judgment motion on this issue, although Penney correctly stated that the motion was untimely, Penney was certainly on notice that the court might consider the motion, as no ruling had been made as to the untimeliness of the motion. Therefore, the court finds that Penney had notice as to the possibility that a motion for summary judgment in favor of Hastie on the counterclaims could be granted. Accordingly, the court finds that, based on the undisputed facts and legal precedent, and for the reasons as discussed above, summary judgment should be GRANTED in favor of Hastie on Penney's three counterclaims.

### CONCLUSION

Based on the above discussion, I recommend that Defendant's motion for summary judgment on the amended complaint be DENIED, and Defendant's motion for partial summary judgment on its counterclaims should also be DENIED. Plaintiff's motion for summary judgment on the counterclaims should be DENIED as untimely. However, I recommend that summary judgment on Defendant's counterclaims be GRANTED *sua sponte* in favor of Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

SO ORDERED.